# IN THE MATTER OF A. S. HUMPHREYS and FRANK E. THOMPSON, Attorneys at Law.

### ORIGINAL.

SUBMITTED JULY 10, 1903.            . DECIDED AUGUST 10, 1903.

#### FREAR, C.J., GALBRAITH AND PERRY, JJ.

An attorney is not permitted to serve a new client against a former client in the same matter in which he represented his former client. If he does, the penalty will depend upon the circumstances. Ordinarily, it will be disbarment, but in this case it is made suspension for one year, in view of the circumstances—especially the looseness. of the attorney's relations to his former client.

It is gross misconduct—meriting disbarment—for an attorney to attempt, by appeals to friendship and by threats and otherwise, to induce an opposing attorney to betray his, the latter's, client, an aged and weak-minded man, by advising him to consent to an unfair proposal of compromise and the taking of extortionate fees.

OPINION OF THE COURT BY FREAR, C.J.

(Galbraith, J., dissenting.)

This proceeding is an episode of the Sumner litigation, long since become notorious, and more particularly of what is known as the Ropert case in that litigation, recently decided by this court, *ante* 76. In that case the court was requested by Messrs. Humphreys, Thompson & Watson, attorneys in the case, to investigate the conduct of counsel on both sides, such conduct having been questioned. The court thereupon, with the acquiescence of opposing counsel, Mr. J. A. Magoon and Mr. G. A. Davis, took the usual course of referring the matter to the Attorney General for investigation and such further action as to him should seem advisable. The result was the institution by him of these proceedings for the disbarment or suspension of the respondents or other dealing with them.

Most of the proceedings in the Sumner litigation are set forth in the decision just mentioned. This is true also of some of the facts and conclusions which are involved in the present case, and for this reason there may be less fullness in the present decision than might otherwise be required.

There have been two periods in that litigation. The first period covered the years 1895-8 and included cases for the cancelation of a power of attorney and the appointment of a receiver, for the cancelation of certain conveyances and finally for the appointment of a guardian over John K. Sumner as an insane person. The guardianship case was discontinued upon the execution of a trust deed by Sumner to Bishop Ropert of the Roman Catholic Church, which deed also referred to a will made

by Sumner. The terms of the deed and will are set forth in the decision above referred to. The greater part of the property covered by the deed and will was an undividd half interest, of questioned title, in certain land bordering on the harbor of Honolulu, which Sumner had previously leased to the Oahu Railway and Land Company for 99 years and for the purchase of which for $100,000 he had given an option to the company in the lease.

The second period of litigation—the one in which we are now chiefly interested—was begun August 4, 1902, by the bringing of a suit by the railroad company against Sumner and his trustee, the Bishop, for the specific enforcement of the option. On September 4, 1902, Mrs. Maria S. Davis, Sumner's sister, brought proceedings for placing him under guardianship and also a suit to cancel the trust deed and the lease and enjoin the execution of the option. All these three suits were settled October 13, 1902, by the discontinuance of the railroad suit, the withdrawal of the appeal from the decree dismissing the bill in the injunction suit, the entering of a decree dismissing the petition and declaring Sumner sane in the guardianship suit, the execution of a deed of the property in question, together with a certain small tract which had been reserved in the lease, to the railroad company for $110,000, and by the distribution of that sum as follows: $10,000 each to Sumner's grand-nephews and grand-niece, W. S. Ellis, J. S. Ellis and Mrs. Buffandeau, to Maria S. Davis and the Bishop, $10,500 to the various attorneys (one of the attorneys having previously received a retainer of $500), $1,000 to one Cathcart, a friend of Sumner, and $475 for stamps on the deed, leaving $48,025, which Sumner shortly after withdrew for himself. On October 27, 1902, the Bishop brought a suit in form for his discharge as trustee and the appointment of a successor, but the substantial issue in which was between certain of the defendants, namely, Sumner on one side, and the Ellises and Mrs. Buffandeau

on the other, as to whether the trust had terminated or not, that is, whether Sumner was entitled to the $48,025 or not. This last mentioned suit is referred to as the Ropert case and is the one in which the decision above mentioned was filed.

The charges against each of these respondents are in general of "professional improprieties, malpractice, deceit and infidelity to his client, and gross misconduct", and more particularly (in substance, without setting forth the details of the complaint,) that they acted as attorneys for Sumner in the railroad and guardianship cases, and knew that all claims of the Ellises (including Mrs. Buffandeau, née Ellis) to the proceeds of the sale had been disposed of in the settlement referred to, but that nevertheless soon after such settlement and especially in the Ropert case they acted as attorneys for the Ellises in opposition to the interests of their former client, Sumner. A further charge is made against the respondent Humphreys, to the effect that, while acting as such attorney for the Ellises, he proposed to J. A. Magoon, as attorney for Sumner, that he, Magoon, should betray the interests of his client, Sumner, and induce him to submit to a further and extortionate demand on the said funds by the Ellises and that said Humphreys and Magoon should each demand and take an unreasonably large fee therefor, and threatened that unless his proposal was accepted he would prevent by the use of legal process said Sumner from exercising any control over said funds during the rest of his, Sumner's, life.

These are grave charges. Considering the nature of proceedings of this character and the possible results to persons who have attained admission and perhaps prominence at the bar only after years of study and training and experience, and who and whose families may be largely dependent for their means of livelihood upon the exercise of their privileges as members of the profession, it goes without saying that the court should act in cases of this kind with unusual caution both in weighing the

evidence and in determining the penalty, and such is the course laid down in the books.   And yet, however disagreeable the function of passing upon the alleged wrongful conduct of a member of a noble profession, the court, as likewise laid down in the books, has a responsibility in the matter and cannot shirk its duty.   The nobler the profession the greater the care that should be observed in keeping its practice unsullied.   In *United States v. Costen,* 38 Fed. 24, Mr. Justice Brewer, of the United States Supreme Court, then Circuit Judge, in disbarring an attorney for merely seeking employment on one side after his employment had ceased on the other and suggesting that he had in his possession important facts, said: "Now, it is the glory of our profession that its fidelity to its client can be depended on; that a man may safely go to a lawyer and converse with him upon his rights or supposed rights in any litigation with the absolute assurance that that lawyer's tongue is tied from ever disclosing it; and any lawyer who proves false to such an obligation, and betrays or seeks to betray any information or any facts that he has attained while employed on the one side, is guilty of the grossest breach of trust.   I can tolerate a great many things that a lawyer may do,—things that in and of themselves may perhaps be criticised or condemned when done in obedience to the interest or supposed interest of his own client, and when he is seeking simply to protect and uphold those interests.   If he goes beyond, perhaps, the limits of propriety, I can tolerate and pass that by; but I cannot tolerate for a moment, neither can the profession, neither can the community, any disloyalty on the part of a lawyer to his client.   In all things he must be true to that trust, or, failing it, he must leave the profession."   In the case of *Boone,* 83 Fed. 944, the United States Circuit Court of Appeals for the Ninth Circuit, in disbarring an attorney who, as in the Costen case, had intimated that he might be open to employment on one side, after his employment on the other had ceased, and suggested that he was in possession of important

facts, but who also had obtained a general release from his for·
mer client from all obligations arising out of his employment,
and who claimed to have withdrawn from such employment from
a sense of duty because he had discovered fraud in the case and
not to have charged for the services he had rendered, and who
claimed that he intended not to disclose the information he had
but merely to use it in cross-examination of witnesses, &c., said:
"It is the general and well-settled rule that an attorney who
has acted as such for one side cannot render services profes-
sionally in the same case to the other side, nor, in any event,
whether it be in the same case or not, can he assume a position
hostile to his client, and one inimical to the very interests he
was engaged to protect; and it makes no difference, in this re-
spect, whether the relation itself has been terminated, for the
obligation of fidelity and loyalty still continues." Realizing
our duty to the respondents on the one hand and to the profes-
sion and the public on the other, we have, after hearing the evi-
dence at the trial and observing the witnesses, read over all of
the 573 pages of testimony and numerous documents introduced
and considered them with the utmost care, but after making all
due allowances on the side of caution and leniency we are con-
strained by the force of facts to find the respondents guilty of
the charges in part at least.

The first question naturally is, what were the relations be-
tween the respondents and Sumner in the litigation up to the
time of the settlement and what in the subsequent proceedings.
There is no question as to the latter. The respondents, especial-
ly Mr. Humphreys, acting for the Ellises, took active steps the
very day after Sumner withdrew the $48,025, to prevent his
keeping it ,and in consequence of their action the Bishop brought
suit, out of abundant caution, as we believe, to obtain the opin-
ion of the court as to the propriety of his payment of the money
to Sumner, and throughout that case the respondents, especially
Mr. Humphreys, representing the Ellises, fought against Sum-

ner's interests not only with all their strength but with marked acrimony. There was nothing improper in itself in their ardent struggle for the Ellises in that suit. Although the case was decided against them on the ground that the trust deed was revocable and had been revoked, yet, as the court assumed, the deed was *prima facie* irrevocable, and it was only in view of extraneous evidence taken in connection with the terms of the deed that the court was led to its conclusion, and as to whether such extraneous evidence was sufficient the court was divided. That was not a frivolous suit by any means. The conduct of the respondents, though subject to criticism in several other respects, was improper, if at all, in that case, so far as the charge now under consideration is concerned, because of their relations to Sumner in the prior litigation. Their contention is that in that prior litigation they represented the Ellises alone (including Mrs. Buffandeau), and not Sumner at all. Although they appeared as Mr. Sumner's attorneys, they contend that it was with the distinct understanding that they represented only the Ellises. It may be that they could properly appear nominally for Sumner and really for the Ellises if that were clearly understood, although, as Mr. Humphreys now concedes, it might be unwise to do so for various reasons, especially under some circumstances, but whether, if they did so, they could afterwards properly appear against him in respect of the same matter might be a question. In our opinion, however, the evidence shows that their relations to Sumner in the earlier litigation was closer than that. Nor is it, on the other hand, because of their conduct or relations toward Sumner in the earlier litigation that they are now charged, although, assuming that, as they contend, they were employed to protect the interests of the Ellises alone as supposed beneficiaries under the trust deed, they were in our opinion, guilty of great recklessness in assisting and participating in the distribution of the trust fund without so much as looking at the trust deed or the will to ascertain whether their

terms permitted such distribution, which terms, as the respondents afterwards contended and as the court held in the Ropert case, did not permit of a distribution even with the consent of all the persons who acquiesced therein. They not only did not take proper precautions in view of the fact that the fund was a trust fund in which others were interested, but they did not with a view to the rights or interests of their own acknowledged clients, if their own statements are true. The gravamen of the charge is that they acted first for Sumner and then against him in respect of the same matter, even if their actions in either capacity alone would be above criticism. There being no dispute as to their appearance against Sumner in the later proceedings, the main question is as to what were their relations to him in the earlier. The facts tending to show what those relations were are substantially as follows:

On the 5th of August, 1902, the day on which service was made on the Bishop in the railroad case, the three Ellises called at the chambers of the respondent Humphreys, then a Circuit Judge, to ascertain if he would act as attorney in that case. Judge Humphreys said that he could not, because he was on the bench, and recommended to them Mr. Henry E. Highton, and, they acquiescing, he arranged an interview between them and Highton for the next morning at his chambers. At that interview they engaged Highton for a retainer of $500 and a fee of $2,000 additional. The Ellises were not parties to the suit, but on the day, the 20th of that month, that their uncle, Mr. Sumner, who was a party, arrived from Tahiti, they took him to Highton and he, Sumner, then confirmed the arrangement they had made with Highton, paying the retainer and agreeing to pay the fee. Thereafter Mr. Highton acted primarily for Mr. Sumner, but in a more general sense represented the Ellises also.

While still on the bench, Judge Humphreys told his brother-in-law Mr. Magoon, that he, Humphreys, could come into the case after he left the bench and asked Magoon's opinion as to

the propriety of his doing so—in view of the fact that the case had been begun in his court, the bill having been addressed to him as First Judge of that Circuit Court. They talked the matter over quite generally. According to Magoon, Humphreys said that the case could be continued from time to time until he left the bench and then he could decide whether to go into it. They talked of Sumner's interests only. After Judge Humphreys left the bench, which he did at the end of that month, he told Magoon that he had been called into the case. When Humphreys left the bench, Highton, who had been told by the Ellises that Humphreys was expected to come in, went to Humphreys and offered him half of his fee if he wished to come in. Humphreys declined, saying that he would attend to his own fee, if he came in.

On the 4th of September, Sumner having insisted on a settlement of the railroad case, and having decided upon a disposition of the proceeds of the land that was to be conveyed, including the placing in trust of the greater part of those proceeds for the Ellises, they were all at Highton's office to arrange the settlement, when W. S. Ellis telephoned for Mr. Humphreys. The latter came and objected to the proposed terms of the trust deed, principally on the grounds that the trustee was not to be under bond and was to receive too large a compensation. The result was that the proposed settlement fell through and was never resurrected. It was at that meeting that Humphreys, Thompson & Watson, who had formed a partnership the day Humphreys left the bench, were retained. There is some dispute as to the nature of the arrangement. According to Humphreys, he came to the meeting as representing W. S. Ellis and was there retained by all three Ellises. During the meeting W. S. Ellis asked Humphreys what his fee would be, to which the latter replied, "the same as Highton's." Apparently comparatively little was said upon the matter. Much seems to have been taken for granted in view of previous understandings and the relations between the parties. Mr. Humphreys says that he was

retained by the three Ellises, but that he expected his fee to come out of the fund. The Ellises, whose testimony on this point was repudiated by Mr. Humphreys, whose witnesses they were, say they themselves were to pay the fee. That their testimony on this point was false was apparent even without Mr. Humphreys' repudiation. Mr. Highton says in substance that while the arrangement was made principally by the Ellises it was acquiesced in or confirmed by Mr. Sumner, and that Sumner agreed to pay the fee. Mr. Sumner says Humphreys, Thompson & Watson as well as Highton were his attorneys, but it is unnecessary to rely on his testimony. There is no doubt as to Mr. Highton's understanding, and that was that the firm of Humphreys, Thompson & Watson were then engaged by the Ellises and Sumner together, although particularly at the request or desire of the Ellises. This arrangement is just what might be expected in the light of the circumstances and the relations of the parties and harmonizes with the subsequent acts of all parties.

At that time Sumner and the Ellises were exceedingly friendly. He was then living with Mrs. Buffandeau, who had taken him to her house the day he arrived. She had held his power of attorney for a long time and received from the Bishop for Sumner the latter's entire net income from the property under the trust. They were constantly the recipients of his bounty— to a lavish extent. At that meeting he proposed to give them $75,000. He had wanted to adopt them when he was here the year before. They were practically one family. They had engaged Mr. Highton precisely as they had proposed to engage Mr. Humphreys. They did so in a general way and in their own names, as Sumner was not here. But they understood that it was really for Sumner that they were acting, for they took him to Highton the day he arrived and, as they expected, he at once followed their advice, ratified all that they had done, paid the retainer, agreed to pay the fee, and accepted Highton as his attorney, though he had never seen nor heard of him before. As

W. S. Ellis testified, they had not expected to pay the fee though they had promised to do so. Their uncle was credulous and easily influenced as well as fond and generous. They evidently had had no doubt that he would ratify Humphreys' employment if they could have retained him instead of Highton. At the meeting when Humphreys was retained, Sumner was present; there was then no occasion for the Ellises to retain Humphreys on their own account alone. They had been friendly with him for several years and W. S. Ellis had been a bailiff of his court for a long time. They had complete confidence in him and wanted him, and it was only natural that they should expect their uncle to acquiesce in their wishes and engage Humphreys. They were scarcely able themselves to pay the fee. It is certainly not at all improbable that, as Mr. Highton puts it, Sumner, though unwilling to have personal relations with Mr. Humphreys, on account of certain past difficulties between them, was perfectly willing, in view of the desire of the Ellises, to have him retained to assist in the case, and that he was retained for all but more particularly for the Ellises and perhaps more particularly still for W. S. Ellis. While Mr. Highton acted as leading counsel throughout until the settlement, and both Sumner and the Ellises were satisfied with him, yet on important occasions, as at each of the two proposed settlements, they each wished to have present some one in whom they had special confidence. The Ellises wanted Humphreys or Thompson and Sumner wanted his friend Cathcart.

Now as to the subsequent acts. After that meeting, Highton and Humphreys went together to see the Bishop and then to the attorneys for the railroad company to see if they could not induce the latter to give a few thousand more than the two thousand five hundred dollars that the company was then willing to give for the tract that had been reserved in the lease. This, of course, in addition to the $100,000 called for in the option for the rest of the property. On returning to his office Mr. Humphreys told Mr. Thompson what had occurred.

That evening the guardianship and injunction suits were begun. The papers were served on Sumner at the house of Mrs. Buffandeau, and were taken by Mr. Buffandeau or Sumner to Mr. Highton. The next day Mr. Highton took the papers to the office of Humphreys, Thompson & Watson, and informed Mr. Humphreys of the new developments. Some conversation was had in which Mr. Humphreys said, among other things, that owing to other engrossing engagements he could not give his personal attention to the cases and moreover that owing to the feeling between him and Sumner, he did not care to. He referred particularly to some differences he and Sumner had had several years before and to Sumner's having snubbed him on the street that day. Mr. Humphreys, however, said that Mr. Thompson (of their firm) would act in the case. Humphreys and Thompson contend that this was with the distinct understanding that Mr. Thompson should, as representing the Ellises alone, merely assist Mr. Highton because the Ellises might be interested indirectly, and because Mr. Highton had been here only a short time and had not become familiar with the local practice. Highton denies that there was any such understanding or any "segregation between services in the guardianship case and general services involved in the whole litigation." That day Mr. Highton prepared the answer in the guardianship case. There is some dispute as to whether it was typewritten in the office of Humphreys, Thompson & Watson. The respondents endeavored to show that it was not, but the only witness who was able to testify positively on the subject was Mr. Crook, then an attorney in their office. He, produced by the respondents, testified that the answer was typewritten there, that he had previously read it in Highton's office, and that Thompson had helped decipher a portion of it in their office, their typewriter having found some difficulty in reading Mr. Highton's writing. The next day, September 6, the answer was filed. The signature of counsel thereto is "Henry E. Highton, Humphreys, Thompson & Watson, attorneys and counsel for re-

spondent, John K. Sumner," the words "Humphreys, Thompson & Watson" being in Thompson's writing. Mr. Thompson says that he signed with the understanding that they were representing the Ellises and that he was to appear merely to assist Mr. Highton in the trial. On the same day a motion and a notice of the motion to set the case for hearing were filed, each signed "John K. Sumner, by Henry E. Highton, and Humphreys, Thompson & Watson, his attorneys," the words "Humphreys, Thompson & Watson" being in Thompson's writing. The hearing in that case extended over two weeks, the days of actual hearing being some eight or nine. Mr. Thompson was present every day, consulting with Highton, arguing questions of the admissibility of evidence, &c., to the court, and, to use his own language, "took a most active part, just as active as I could take." The clerk entered the names of Highton and Thompson as appearing for Sumner each day. Judge De Bolt, who tried the case, regarded Thompson as well as Highton as Sumner's attorney throughout. When the settlement was in progress, Mr. Davis, an attorney for the petitioner, and Mr. Thompson alone, without Mr. Highton, informed the Judge that probably the case would be settled. Later, Davis and Thompson presented to the Judge a form of decree dismissing the petition and declaring Sumner sane. The Judge had some doubts about signing a consent decree in such a case, but was ready to do so because he had come to the conclusion from the evidence that Sumner was sane. None of the attorneys who had appeared in the case being present except Davis on one side and Thompson on the other, some remark was made about both sides being represented. The Judge was given to understand that both sides were represented. The Judge then wished it to appear that the decree had not emanated from the court, and suggested that a motion or something else should be filed to show that it was a consent decree, whereupon the words "requested, approved and agreed upon before signing by his Honor" were written below the decree and just over the signa-

tures of all the counsel in the case, which were already there, the signature of "Humphreys, Thompson & Watson" as "counsel for John K. Sumner," being in Thompson's writing. In this Mr. Thompson acted for Sumner and held himself out to the Judge as Sumner's attorney in the absence of Mr. Highton. Mr. Thompson alone for the Sumner side conducted with the attorneys on the other side the negotiation that culminated in the settlement of the guardianship case. Those negotiations were quite active from Thursday, October 9, to Monday, October 13, the day of the settlement. The Ellises, it will be remembered were not parties to that suit, though it was believed that its result would affect them indirectly. Both Magoon and Davis, attorneys on the other side, as well as the Judge and Highton, with whom Thompson was associated, understood all through that Thompson represented Sumner as well as the Ellises. They so understood not only from Thompson's activity on behalf of Sumner in court, but from his words and actions during his negotiations with them, from his references to Sumner, his statements as to what Sumner was willing or unwilling to do, &c. Mr. Davis, it may be mentioned, was a witness for the respondents and apparently very reluctant to say anything against them, but he seemed to be pretty clear on this point. During those negotiations, on Thursday and Friday, Mr. Thompson informed Mr. Humphreys as to what was doing and consulted with him in regard to the matter. On Friday Mr. Humphreys left the city and was absent a week.

At the final settlement, the various sums, excepting those paid to Mrs. Davis and her attorneys, were paid by the Bishop on Sumner's order, contained in a letter specifying the amounts and persons in each instance. In this order Sumner directed the Bishop to pay to Humphreys, Thompson & Watson $2,500. The Bishop paid this amount to Thompson under this order and the latter gave a receipt as follows: "Honolulu, H. I., Oct. 14, 1902. Received from Rt. Rev. Gulstan F. Ropert, Trustee John K. Sumner, Twenty-five hundred Dollars, In full fee

professional service litigation between Oahu Ry. & Land Co. and John K. Sumner; and re proceedings to appoint guardian instituted by Maria S. Davis; and directed to be paid by letter of John K. Sumner. $2500. Humphreys, Thompson & Watson." This receipt was on a printed blank, the written part and signature being in Thompson's writing. Thus he acknowledged that he was paid for services in the guardianship case and by Sumner. So far as appears, no arrangement whatever had ever been made with the Ellises in regard to Humphreys, Thompson & Watson's appearing in the guardianship case,—except their general retainer above referred to, which was before the guardianship suit was begun. The list of payments which Sumner directed the Bishop to make was made up by Highton. There was not a word said, so far as appears, in all the negotiations for settlement about Sumner's paying for the Ellises the fee of Humphreys, Thompson & Watson. It seems to have been taken for granted all along that Sumner was to pay that fee—and not as part of what was to be paid to or on account of the Ellises. There was nothing to show that any arrangement was made for the payment of a fee on behalf of the Ellises as part of the settlement, different from the original understanding as to the payment of that fee. In regard to the fee of the attorneys for Mrs. Davis, the situation was different. They endeavored to get Sumner to pay that, but Sumner declined, at least so Thompson represented to opposing counsel, and those attorneys then got the railroad company to pay $5000 additional to what had already been agreed on between it and Sumner,—apparently on the strength of the refusal of Mrs. Davis' attorneys, or one of them, to consent to a settlement of the guardianship case unless their fee was paid. That fee was paid, with the $10,000 to Mrs. Davis, separately, and was regarded in a different light from the fee paid to Humphreys, Thompson & Watson. The latter was regarded in the same light as that paid to Highton.

There are several other matters bearing on the question of the relation sustained by the respondents to Sumner and the Ellises separately. Some of those relied on by the respondents will be referred to. At the meeting at which the respondents were retained, Humphreys said that as representing W. S. Ellis he objected to the proposed trust deed. From that it is argued that he was not attorney for Mr. Sumner. The inference goes too far. The same reasoning would show also that Humphreys did not represent the other Ellises, which of course, is contrary to fact. The true explanation seems to be that at that stage Humphreys did represent only W. S. Ellis, for he was called in by him alone, but after the matter of the proposed trust deed was disposed of, Humphreys made arrangements according to his own statement, with all three Ellises, and, according to Highton, with Sumner also. Again, on the first day of the hearing in the guardianship case, according to two of the Ellises, Highton asked them where Thompson was, and, upon their replying that they did not know, said, "Well, he is representing you Ellises and I want him here." If that is what was said, it does not go very far. Highton no doubt understood then, as he wrote a little later and says now, that Humphreys, Thompson & Watson more particularly represented the Ellises. If his remark implied that Thompson did not represent Sumner, it equally implied that Highton himself did not represent the Ellises, which, of course, was contrary to fact. The inference goes too far for the purposes of the respondents. At best an off-hand remark like that, if it were made, would not under the circumstances overcome other evidence of a much weightier sort. Again, at the final settlement, Highton, who had objected to the settlement of the guardianship case and the payment of $10,000 to Mrs. Davis, because he believed it a case of blackmail, still insisted that it could be carried out only against his advice and said that he would yield only to Mr. Sumner's insistence on the settlement. Thompson then asked Highton whom he represented, to which Highton replied that he represented John K.

Sumner. Thompson replied that Highton seemed to forget that he was employed by the Ellises as well. Highton replied that in these proceedings he represented John K. Sumner, whereupon Thompson replied, "repeating the words parrot-like," as he says, that in these proceedings he represented the Ellises and insisted upon the settlement of the guardianship case and the payment of the $10,000 to Mrs. Davis. They were "hot", as Thompson says. Thompson's reply was somewhat of a play on words. Under the circumstances the language may easily be explained without the necessity of holding that Thompson represented the Ellises alone. The inference here also goes too far. If these words show that Thompson did not represent Sumner, they show also that Highton did not represent the Ellises, which is contrary to fact, as shown beyond question not only by the testimony of Highton and the Ellises at the present time, but by their statements made in writing at that time, as well as by the testimony of Mr. Thompson in the present case. Again, Thompson makes considerable of the fact that he was not present as a rule at the conferences outside of court between Highton, Sumner and the Ellises. If that shows that he was not attorney for Sumner, it shows likewise that he was not for the Ellises, which is contrary to fact. As matter of fact he was present with the others in court every day, he took part in at least two conferences outside of court when all were present, and Highton often went to his office to consult him. Humphreys, of course, had nothing to do with Sumner during the entire proceedings, but that was the understanding, and, so far as appears, he had nothing to do with the Ellises either. After the first day, his part seems to have been confined to consultations with Thompson.

There was no doubt that it was understood by all that Humphreys, Thompson & Watson represented the Ellises more particularly and perhaps W. S. Ellis more particularly still, and there is no doubt that Humphreys and Sumner personally felt hostile to each other. We may concede that they did not consider that their relations with Sumner were fully all that

are usually supposed to exist between attorney and client
There are all degrees of closeness in the relationship of attorney
and client. It is clear that in this case the relationship of the
respondents to Sumner were such as to make it improper for
them to take sides against him in immediately subsequent
proceedings respecting the same matter. If their relationship
were that of attorney and client to its fullest extent, there
could be but one conclusion, as stated by Mr. Humphreys at
the hearing—that of disbarment. Under the circumstances, some-
thing short of that would be sufficient. What the penalty should
be will depend to some extent upon the nature of the settlement.
In our opinion it is an aggravating circumstance that the res-
pondents knew or ought to have known that the settlement was
understood to be in full and that Sumner was to have the re-
maining $48,025 absolutely. For the respondents to take a
position against Sumner afterwards in opposition to that un-
derstanding shows greater disregard of the requirements of
professional ethics. That that was the understanding is evident
from the following:

There was some difference of opinion among the members of
this court in the Ropert case as to the bearing of the evidence
in regard to the understanding at the time of the settlement
upon the question of the revocability of the trust deed. That
question is not now involved. There is also much evidence in
this case upon that point that was not in that case. We have
now to consider merely what the understanding of the parties
was at the time of the settlement and more particularly what
Sumner's understanding was, and how far the respondents knew
or ought to have known that. The theories of the respondents
as to that understanding, as well as upon some other points,
have been so varied and shifting that it is difficult to treat of
them in a satisfactory manner. They seem to have two prin-
cipal theories in regard to the settlement. The one chiefly
relied on is that the balance of the money, $48,025, was to
remain subject to the trust by express understanding or agree-
ment. The only direct evidence adduced in support of this, in

either the Ropert case or this case, is that, as contended, at the final settlement Mr. Buffandeau asked Sumner what he was going to do with the rest of the money, and that Sumner replied "the Bishop is still my trustee, you will get it when I die," and that then Thompson jumped up and said "that is all we want to know; children, sign the deed." As was stated in the opinion in the Ropert case there was such conflict in the evidence as to just what was said. It was pointed out there that, as shown by all the evidence on that point, the question was one of mere idle curiosity asked by one who had no interest or claim whatever, that the reply was made in anger by Mr. Sumner, who had become wearied with the importunities of the Ellises for "more," and that the question itself implied that Sumner could do as he pleased with the rest of the money. The evidence in the present case is stronger against the respondents' contention. All agree as to the question asked by Buffaundeau. Now, also, it seems to be generally agreed that Sumner's answer at first was "none of your business," although Sumner alone testified to that in the Ropert case. Upon Buffandeau's saying further that they wanted to know before they signed, it is generally agreed that Sumner said, "the Bishop is my trustee," which, of course, was perfectly true, for the Bishop remained his trustee for a week longer before he decided to draw his money, but it seems to be pretty evident that he did not say "you will get the money when I die," and it is probable that Thompson did not say "that is all we want to know" and doubtful if he said "children, sign the deed." The respondents' star witness, Mr. Cathcart, says "the matter stopped right there * * * Mr. Buffandeau smiled and it stopped abruptly," that is, after Sumner's reply, and that he does not "recollect Mr. Thompson saying anything." Not only could the question and answer not be held to show the understanding contended for, considering the circumstances; not only does it imply the contrary, but the contention that the Ellises signed the deed only on that alleged assurance of Sumner that the rest of the money would remain subject to the

trust is simply ridiculous. According to all the witnesses (the Ellises and Thompson included) Sumner, the Ellises and Thompson were all insisting on the settlement including the execution of the deed to the railroad company, against Highton, who persisted in his position that the part of the settlement relating to the guardianship case could be carried out only against his advice. The deed was already prepared. All were ready enough to sign, according to the direct testimony. That part had been settled. Thompson was called to the meeting by Buffandeau only because of objections to the compromise of the guardianship case. Furthermore, Buffandeau's question was not asked until after even Highton had yielded to Sumner's wishes and Sumner and the two Davises had already signed. In this connection reference may be made to the testimony of Mr. Watson, respondents' witness, to the effect that immediately after the settlement Thompson told him about it and said that the rest of the money was to remain subject to the trust. This is relied on to show Thompson's understanding at the time. But it is noticeable that Thompson's reason then given for that conclusion, as stated by Mr. Watson, was not that there was an agreement to that effect, but merely, as a conclusion of law, that the proceeds would be subject to the trust because they stood in the place of the property. That reason would, of course, require all the proceeds, if any, to remain subject to the trust. But the point to be made now in connection with Buffandeau's question is that it likewise appears from Watson's testimony that Thompson said the same thing to him before going to the meeting at which Buffandeau asked his question, in other words the question and answer made no difference in Thompson's estimation at the time.

Respondents rely also on the fact that the Davises were required to sign a release or agreement to release, and that the Ellises were not required to do so. This release now appears to have been suggested by Mr. Humphreys and not by the Ellises. The respondents' neglect to get releases from the Ellises as well as from the Davises for their client Sumner, is made one

of the grounds of complaint in the information in this case. But while doubtless that would have been a wise course to pursue and there is some testimony by one of respondents' witnesses to the effect that Sumner afterwards complained that that was not done, and two of the witnesses against the respondents testify that Thompson, when procuring the signatures of Mrs. Davis and her son, R. W. Davis, told them that the Ellises were to sign similar releases, we do not find the respondents guilty as to that. No such releases were contemplated. The distribution was made on the theory that the money was Sumner's and that no releases were needed. This point was disposed of in the Ropert case. One or two observations may be added, however. The evidence (on both sides) in the present case seems to show that so far as Sumner and Mrs. Davis were concerned (as distinguished from their attorneys) Mrs. Davis was acting in good faith in bringing the guardianship suit and was willing to discontinue that suit, if Sumner so desired, whether she received any money or not, and that it was not only Sumner's proposition to pay her $10,000 as a gift as well as to pay $10,000 to the Bishop and each of the Ellises as gifts, but that it was his purpose, as he insisted at the time, to treat them all alike. On the day of the settlement he left the Ellises and went to live at Mrs. Davis', where he has been ever since. Digressing now for a moment to the question of the relation of attorney and client we may, while on the subject of the release, refer to a contention, perhaps hardly more than suggested, by the respondents, to the effect that the fact that the release was prepared by them and retained by them and afterwards turned over to the Ellises shows that they were attorneys for the Ellises alone. It does not appear when it was turned over to the Ellises, but the facts connected with the release no doubt do tend to support the respondents' theory to a certain extent, assuming of course, that they were not then acting with duplicity—which we do not hold. And yet those facts can at best hardly outweigh other facts of less doubtful purport. It was only natural to get a release from the Davises, as they were at

least technically hostile to Sumner and actually so to the
Ellises while the Ellises were supposed to be friendly to Sum-
ner, and the respondents were attorneys for the Ellises as
against the Davises. Moreover the release was not to the
Ellises. It was to Sumner and such persons as he should name.
From that the inference, as far as it goes, which is not very far,
is that the respondents were Sumner's attorneys. The fact that
they kept the release may be accounted for on the theory that
they were his as well as on the theory that they were the Ellises'
attorneys, though we think that they kept it as more particularly
representing the Ellises. The fact that they gave it to the
Ellises, if that is a fact, is of little significance if, as was
apparently the fact, that was after they and the Ellises had
taken sides against Sumner.

Now, returning to the question as to the understanding at
the settlement, the other of the respondents' two principal
theories seems to be that the balance of the money remained
subject to the trust as matter of law, because of the absence
of an agreement to distribute it. They perhaps go a little fur-
ther by attempting to maintain that the distribution of a part of
the entire fund was a matter of definite contract made with
reference to the Ellises' supposed interests as beneficiaries under
the trust, and that the Ellises consented to accede to Sumner's
wish to give Mrs. Davis and the Bishop each $10,000 out of the
common fund and to sign the deed to the railroad company in
consideration of Sumner's consenting to their withdrawing
$10,000 apiece from the fund. (They say nothing about the
$1,000 given to Sumner's friend, Cathcart.) The difficulty
with this is that it is a mere hypothesis with nothing in the
evidence to support it, other than the fact that, in view of
the terms of the trust deed, there was considerable ground on
which to have proceeded on such a theory, if the Ellises and
their attorneys had attempted to do so. There was no talk
whatever of the respective interests of the Ellises and Sumner
under the trust. Neither the Ellises nor their attorneys so
much as thought of examining the trust deed to see what the

interests, if any, of the Ellises thereunder were.   One of the
respondents' strongest points in the present case is that they did
not know the terms of the trust deed or will or the interests
of the various parties thereunder.   Mr. Highton, who alone
of all the attorneys examined the trust deed and will, took the
position within a few weeks after he was retained and held it
consistently thereafter, as shown by his acts done and words
written at the time, that the enire fund was Sumner's and that
whatever others should receive would be by way of gift from
him.   It is true, the railroad company, warned, by all the pre-
vious Sumner litigation, of the disposition of his relatives to
question his acts, insisted that they all, including the Davises,
who were supposed to have no interest under the trust, should
join in the deed, and there is some evidence tending to show that
the Ellises made use of this as well as the influence they had over
him to force Sumner to give them more than $10,000 each, but
there is nothing whatever to show that they ever during those
negotiations acted on the theory that the payments were in the
nature of a partial distribution, by way of mutual considera-
tion or contract, of funds held in common.   Their testimony
all through is that Sumner wished to give them $10,000 apiece,
&c.   Mr. Highton regarded these payments to the Ellises as
purely voluntary gifts by Sumner to his relatives, arranged
between themselves as a family matter, and that they had no
legal connection with the settlement.   Mr. Humphreys now
goes so far as to say that, in his opinion his firm should return
the $2,500 received by them at the settlement and the $1,000
afterwards received as their fee from the Ellises in the Ropert
case, because they were culpably negligent in not securing
the balance of the money for them by a new trust
deed, but, although he contends that he was employed by the
Ellises chiefly in the matter of a proposed new trust deed,
neither he nor Thompson suggested such a deed at the time of
the settlement, although Thompson consulted with Humphreys
on the Thursday and Friday before and told him what it was

proposed to do and Humphreys suggested getting a release from
the Davises. It may be added, in passing that Mr. Humphreys
says that he had intended to return the fees but had not in-
timated that intention to any one before because he did not
have the money, though he also says that his firm was doing a
business of $45,000 a year. Mr. Thompson on the other hand
contends that his firm earned its fees because it was through
their efforts that the Ellises secured $30,000 from Sumner, but
all the evidence on both sides shows that Sumner proposed him-
self to give them that sum and insisted on doing so. The res-
pondents may have been entitled to their fee under their con-
tract, but not because they secured $30,000 for the Ellises.
It will hardly be necessary to point out further oral evidence
or to refer to the acts of the parties to any extent, in addition
to what was said on this point in the Ropert decision, as to the
understanding at the settlement. Fortunately, we have now in
evidence documents written at the time that leave no room for
doubt. These throw some light on other points also, showing,
for instance, among other things, that Mr. Highton's view as
to the relations of the respondents to Sumner and the Ellises,
is not a new invention on his part devised now as an act of
revenge against the respondents for their abuse of him upon a
recent occasion hereinafter referred to. The following letters
between Highton and the Ellises and Sumner show what they
thought at the time. An attempt was made to show that the
Ellises did not understand them at the time, but they ad-
mitted that the letters were read over slowly to them by High-
ton before they signed (and they are intelligent people and
understand English well) and further that one of them trans-
lated the first letter into Hawaiian in the presence of all of
them though more especially for Sumner's benefit. They are
also unable to say wherein they misunderstood the letters, and
that is not strange since the statements therein are fully sus-
tained by other evidence. There is one error in the first letter
the word "eighty" being written for "ninety" near the end of
the letter.

"October 10th, 1902.

Oahu Railway & Land Co. vs. John K. Sumner and Bishop of Panopolis.

Guardianship of John K. Sumner, John K. Sumner, by his Next Friend, Maria S. Davis vs. Oahu Railway & Land Co. and Bishop of Panopolis.

John K. Sumner, Esquire, William S. Ellis, Esquire, John S. Ellis, Esquire, Mrs. Victoria Buffandeau.

My employment in the first case named above was originally for John S. Ellis, William S. Ellis and Victoria Buffandeau, and it was agreed that my fee should be $2,500.00, of which $500.00 constituting the retainer, has been paid. When Mr. John K. Sumner arrived, August 20th, 1902, it was further agreed that I should represent him, as he was and is the owner of the property involved and entitled to the proceeds thereof. I considered, however, that my employment necessarily embraced the other proceeding and suit above mentioned, and that for them no additional charge should be made. The amount to be paid to me, therefore, for the entire litigation, beyond what I have received, is Two Thousand Dollars.

When Judge Humphreys left the Bench, it was further agreed that he, which of course meant the firm of Humphreys, Thompson & Watson, should also be employed specifically in the guardianship case, and that his and their fee should be Two Thousand Five Hundred Dollars. While his and their employment was limited on the record to the guardianship case, it was understood to apply to the entire business, but more directly to the interests of William S. Ellis, John S. Ellis and Mrs. Victoria Buffandeau.

1. In the case of *Oahu Railway and Land Co. vs. John K. Sumner and the Bishop of Panopolis,* I have kept the time alive to move or plead on behalf of Sumner, and have also thoroughly prepared to file and support a demurrer to the bill of complaint.

2. The case of John K. Sumner, by his next friend, Maria S. Davis, on his motion, has been dismissed, and an appeal from the order taken to the Supreme Court of the Territory of Hawaii. In this case as in the first, I have done a great deal of work.

3.   The guardianship case has been on trial for the greater part of two weeks, and all the proceedings, preliminary and on the trial, have received my personal and undivided attention, aided, as I have been, efficiently, by Mr. Thompson.

I wish it to be distinctly understood and acknowledged in writing by you that, at no time, have I recommended any settlement of this litigation.   During my entire life, I have been, and I now am, uncompromisingly opposed to submission to illegal exactions.   I believe John K. Sumner to be in every respect sane, competent and capable of managing his own property and attending to his own business, and this litigation, the objective point of which is to take money from him which is exclusively his own, in my opinion, is not to be justified in law or fact.   Mr. Sumner, like other men, has a plain right to do as he pleases with his property or money, and I absolutely decline, in a professional capacity, to endorse any proposal which practically denies this right.

But on Thursday, October 9th, 1902, in the presence of the Right Reverend Gulstan F. Ropert, Bishop of Panopolis,—myself, Mr. Thompson, the Ellises, Mrs. Victoria Buffandeau, and John K. Sumner being in attendance,—it was definitely agreed that the entire litigation might be settled on the basis of $105,000.00, to be paid by the Oahu Railway & Land Co., for the rights of John K. Sumner and his beneficiaries and relatives in the Quarantine Island property, and that of this amount, in addition to the fees above mentioned, Ten Thousand Dollars hould be paid to Mrs. Maria S. Davis.   The distribution of the remainder, which belongs to Mr. John K. Sumner, was and is to be settled between him, William S. Ellis, John S. Ellis, and Mrs. Victoria Buffandeau.

I am bound to obey the positive instructions of my clients, and, on this ground and no other, acting under their direction, will do my best to promote the suggested compromise.   I now understand that the Oahu Railway and Land Co. proposes to pay $110,000.00 for a conveyance from all the parties of their entire interest in the property in question, of which Five Thousand Dollars is to go to Messrs. George A. Davis and to Magoon and Lightfoot, attorneys for Maria S. Davis.   The distribution of the entire sum of $110,000.00, so far as settled, is to be as follows:

To Messrs. George A. Davis and Messrs. Magoon
and Lightfoot .............................$ 5,000.00
To Messrs. Humphreys, Thompson & Watson..... 2,500.00
To myself, embracing the whole litigation, and al-
lowing for retainer paid.................... 2,000.00
To the Bishop of Panopolis.................. 10,000.00

This leaves to be divided between John K. Sumner, William S. Ellis, John S. Ellis, and Mrs. Victoria Buffandeau, the sum of Eighty Thousand Five Hundred Dollars, as they may agree among themselves, Mr. Sumner being the owner of the money. They are to meet at this office at eleven o'clock a. m. tomorrow (Saturday), October 11th, 1902, to. determine on the distribution, which is necessarily dependent upon the payment by the Oahu Railway & Land Co.

Faithfully yours,

HENRY E. HIGHTON."

"Honolulu, October 11, 1902.

"Dear sir:—We have read and thoroughly understand your letter to us, dated October 10th, 1902, in reference to the litigation about the Quarantine Island property and all property embraced in the lease and option (so-called) from John K. Sumner to the Oahu Railay and Land Co. The statements in the letter are, and each of them is, correct, and we add that you have in no way advised the compromise of the litigation, for which we hold ourselves entirely responsible, and request you to act under our instructions and, if possible, to consummate the settlement.       Yours truly,

JOHN K. SUMNER,<br>
VICTORIA S. BUFFANDEAU,<br>
WILLIAM SUMNER ELLIS,<br>
JOHN S. ELLIS."

The next document is the letter from Sumner to the Bishop on which the latter paid out the money. No question was raised as to Sumner's right to make the order and no one suggested that the Ellises should join in the order as co-beneficiaries under the trust. This order shows what the Bishop as well as Sumner and Highton understood. It was drafted by Highton and signed by Sumner. Of the $49,025 expressed

in the letter as remaining subject to Sumner's order, $1,000 was paid to Messrs. Holmes & Stanley and Mr. Stewart, attorneys for the Bishop, leaving the $48,025 so often referred to.

"Honolulu, T. H., 13th October, 1902.

"To The Right Reverend

GULSTAN F. ROPERT,

Bishop of Panopolis.

Right Reverend Sir:—Out of the sum of $94,525 in your hands as my trustee on the settlement made with the Oahu Railway and Land Company, William S. Ellis, John S. Ellis, Victoria S. Buffandeau, Maria S. Davis, please pay by cheque at once, the following amounts, to the following persons:

| | |
|---|---:|
| Humphreys, Thompson & Watson | $ 2,500.00 |
| Henry E. Highton | 2,000.00 |
| R. W. Cathcart | 1,000.00 |
| William S .Ellis | 10,000.00 |
| Victoria S. Buffandeau | 10,000.00 |
| John S. Ellis | 10,000.00 |
| To yourself | 10,000.00 |
| | $45,500.00 |

This will leave in your hands altogether $49,025 subject to my order.

Of the sum of $110,000.00 constituting the full settlement, $15,275 has already been accounted for—namely, $5,000.00 to Davis and Magoon, attorneys; $10,000.00 to Maria S. Davis, and $475 constituting my proportion of the stamps on the deed to the Oahu Railway and Land Company.

Faithfully yours,

JOHN K. SUMNER."

The fact that there was an allegation in the Bishop's complaint in the Ropert case to the effect that it was understood that the balance of the money should remain subject to the trust is of little consequence as showing his previous understanding, as we considered in the Ropert case, in which that fact was called to our attention. The complaint was drafted by counsel and, if that allegation was particularly called to the Bishop's attention, he doubtless subscribed to it in reliance on

the representations made by the respondents and the Ellises and not on his own understanding, for he had both acted and said that he had acted on a different understanding in paying the money over to Sumner.

The next papers are the receipts given by the Ellises. These are in Thompson's writing, except the few words printed in the form and the signature by the Ellises. They tend to show what Thompson as well as the Ellises thought at the time. Two are in form as follows, signed by J. S. Ellis and Mrs. Buffandeau respectively: "Honolulu, H. I., Oct. 14th, 1902. Received from Rt. Rev. Gulstan Ropert, Trustee John K. Sumner, Ten Thousand Dollars, In full am't to be paid me under settlement between Oahu Ry. & Land Co. and John K. Sumner, and being am't directed to be paid by letter of J. K. Sumner, $10,000." The other, signed by W. S. Ellis, differs only to a slight extent, reading after the word "dollars" as follows: "In full settlement between Oahu Ry. & Land Co. and John K. Sumner, and being directed to be paid me by letter of John K. Sumner." The fact that all at least except the respondents understood that the settlement was complete and final and that the rest of the money was subject to Sumner's pleasure, is established.

The question remains as to how far the respondents knew or ought to have known that fact. They claim that they did not know of the correspondence between Highton and Sumner and the Ellises and did not see Sumner's letter to the Bishop until long afterwards. We believe that they did not see the former letters until two months later and there is no evidence that they had heard of them earlier. Their clients, the Ellises, may not have told them. As to the letter from Sumner to the Bishop, we will assume that Thompson's statement is true that de did not see it at the time, although the receipts which he wrote refer to it, and Highton thinks he must have shown it to him. It is not unlikely that Thompson wrote the receipts, as he says, on Highton's statement that such a letter would be written, but that does not alter the fact that Thompson knew that the

money was to be paid on Sumner's order alone, as the reference in the receipt to Sumner's letter shows. The receipts also show that Thompson knew that the payments were "in full settlement," though there is perhaps some room for controversy as to what was considered fully settled. There are other specific things that tend to show that Thompson understood the theory on which the settlement was made. For instance, Sumner's answer in the guardianship case which was filed as early as September 6, and which was signed by Thompson as counsel for Sumner, and a portion of which he helped his typewriter decipher when in manuscript form, contains the following, referring particularly to the railroad suit and the proceeds of the sale: "and this respondent proposes to exercise his own judgment, and to act upon his own will, in the disposal of any fruits and avails of the said suit, if compromised, or of his property generally in said Territory." Thompson says that he thinks that he did not read this before signing it but he thinks that he may have read it without noticing this portion during the trial of the guardianship case, that is, before the settlement. Mr. Buffandeau's question referred to above as well as the form of the Davis release, drawn by the respondents, point the same way. But not to multiply specific instances, anyone of which might perhaps, standing alone, be explainable on some other theory, the fact remains that such was the understanding of all at least except Thompson, and is it reasonable to suppose that he, who has not been accused of dullness, could have been in the thick of the negotiations for compromise and not have understood what all the others understood? He was the only one who conducted the negotiations with the attorneys for Mrs. Davis. He and Humphreys both say that they discussed the matter of the settlement the Thursday and Friday before. He was present with all the others at the Bishop's on Friday when the matter was gone over there and he, of course, took part at the final meeting. Grant that he did not so understand, still, can there be any question that, especially considering his relations to Sumner, there was an abundance to put him upon inquiry

before taking sides against Sumner? See *In re Paakiki,* 6 Haw. 518. Even if he might be excused on the theory that there was not enough to put him on inquiry at the time, still the day after Sumner drew the balance of the money and before the Ropert suit was begun he was sent by Humphreys to the Bishop to ascertain the facts, and, according to his own testimony, the Bishop told him in substance that he assumed that the matter had the approval of everybody, and that he had paid the money to Sumner even in spite of the fact that Sumner's attorney, Magoon, had told him that he, Magoon, did not want him, the Bishop, to pay without first consulting his attorney, Mr. Stanley. Thompson returned to the office and told Humphreys. The latter then went to Magoon and learned what he and Sumner understood. Later, a week before the trial of the Ropert case, Humphreys asked Highton if he would testify for the Ellises, and Highton, according to Humphreys, told him that "he understood the settlement was a complete settlement and that the balance of the money belonged to Mr. Sumner," and gave Humphreys copies of the letters above set out between Highton and Sumner and the Ellises.

In closing the discussion on this branch of the case, already protracted far more than intended, reference must be made to the question of Mr. Highton's credibility. To judge from their arguments one would suppose that the respondents' chief defense was abuse of the other side, particularly the Attorney General who is prosecuting at the request of the court and as a result of investigations set in motion by the respondents themselves, and more particularly Mr. Highton and Mr. Magoon. The principal ground for attacking the credibility of these two witnesses seems to be in general that they must both have been moved to perjure themselves by way of revenge against the respondents because of shameful abuse heaped upon them by the respondents. They also endeavor to show that these witnesses falsified in certain particulars. Referring to Mr. Highton alone in connection with branch of the case, we may remark in gen-

·eral that, in our opinion, the calumnies, for they are nothing short of that, hurled against Mr. Highton, are entirely without foundation, so far as has been made to appear. Unfortunately for the the respondents there is in this case a vast amount of evidence against them in addition to Mr. Highton's testimony. Unfortunately also for them, when there was indisputable corroborating evidence, it corroborated Mr. Highton as against the respondents. It might be sufficient to refer merely to the acts of the respondents themselves, already set forth at some length, as corroborating Mr. Highton's testimony. But the particular matters on which the respondents chiefly rely to show Mr. Highton's alleged incredibility will be mentioned. These are of a merely collateral nature. The respondents attempted to show that Mr. Highton falsified as to his earlier views and statements upon the question of the revocability of the trust deed. He testified that he did not remember having stated in his present office (into which he moved more than a month after he was retained) that the will was a part of the trust deed and that they were irrevocable. He testified also that he did not fully make up his mind on that question until two or three weeks after he was retained. The respondents then introduced Messrs. Stanley and Stewart, who had been attorneys for the Bishop, to show that Mr. Highton had made such statements to them, but they both testified merely that he made such statements within a few days only after he was retained, and he, taking the stand again, said that he may have done so within that time, though not as a final legal opinion. In the same connection another closely related matter may be mentioned. Mr. Humphreys took the position that certain views expressed on the fourth of September upon the question of the alleged invalidity of the option in the lease were his and not Mr. Highton's, as the latter seemed to imply, but the witnesses, Messrs. Stanley and Stewart, introduced by the respondents on the matter just mentioned, also went further of their own accord and stated that Mr. Highton soon after his retainer in August expressed these views in regard to the option. A more important

matter from some standpoints arose in connection with the
letters between Highton and Sumner and the Ellises.   The res-
pondents, especially Mr. Humphreys, attempted to make the
court believe that they first learned of those letters during the
trial of the Ropert case and that on the first occasion after they
saw those letters, Humphreys, in righteous indignation, called
Highton a damned liar, scoundrel and fraud, and charged him
with having got their clients, the Ellises, to sign the letter behind
their, the respondents', backs.   It may be said in passing that if
anything is certain in this case from the evidence produced by
the respondents as well as that of the prosecution it is that the
Ellises were Mr. Highton's clients as well as the respondents'
clients when they signed that letter.   So much for Humphreys'
charge against Highton on that occasion.   But the more im-
portant point is that it was shown beyond dispute by entries
made at the time by Highton in his diary, that he told Hum-
phreys of those letters on the 18th of December, a week before
the trial in the Ropert case began, and sent him copies of the
same the next day, and that Humphreys did not empty his abuse
upon him until the 12th of March following—a few days after
the court requested the Attorney-General to investigate the con-
duct of counsel—and it was further shown that Humphreys
spoke to Highton about the letters in a courteous, though com-
plaining, way only a few days after he received copies of them
in December, and that they, Highton and Humphreys, had had
correspondence and personal interviews in an amicable way
from that time until March 12.   Highton's testimony and diary
also show that the statements of the respondents as to what was
said and done on that occasion on March 12 were false in certain
particulars, as well as that their conduct on that occasion did
not reflect any credit upon themselves.   The respondents did
not attempt to rebut Mr. Highton's testimony.   Their abuse
of him upon that occasion they rely upon as his incentive for
falsely testifying against them, as they claim.   According to
Mr Highton they did not use as strong language as they say they
did, but their conduct was such as to make him not care to have

anything to do with them thereafter. He went to their office, at their invitation in response to a telephone communication from him to them on other business, and Humphreys, who had previously told Thompson of his intention, called him, Thompson, in, and then, there being two young men against one elderly man, Humphreys told Highton that his conduct in connection with the letters was the greatest outrage in his professional experience, &c., but did not call him a liar, scoundrel or fraud in his hearing. But it will be unnecessary to prolong the discussion on this line. The least said, the better for the respondents. Fortunately for them we are not disposed to judge them by the standards by which they would have us judge others. It is a curious circumstance that practically every argument or charge aimed by them against opposing witnesses or counsel applies with double force against themselves.

What should the penalty be? As stated above, if the relation of attorney and client existed between the respondents and Sumner to its fullest extent, the penalty, by all the authorities, should be disbarment. Where there are mitigating circumstances, it may well be only suspension. How far the courts go will be illustrated by a few cases. In one case an attorney after the expiration of his term of office as attorney and counselor for the city and county of San Francisco accepted a retainer of $100 from the attorney on the other side, not to accept employment from the city in certain cases. These cases were two of eight hundred cases pending when he took office. He knew nothing of their facts. They were pending and had been decided against the city in the lower court before he took office. He directed that appeals should be taken in all the cases as a matter of precaution. When he accepted the retainer after he left office, the two cases in question had been decided by the appellate court, affirming the judgments below. When he was offered the retainer, he said he had had nothing to do with the cases and knew nothing of them and had not been employed by the city and thought he was in a condition to accept a fee, also that he could do nothing against the city and did not wish, for

appearance's sake, to be consulted in the cases. The one who retained him said that he did not want him to do anything, and that all he wanted was that he should not be employed against him. The city had already engaged other counsel. The attorney in question did not have anything further to do with the cases, and offered to give his successor in office any information about any cases in the office. The court after a very lengthy opinion upon the law suspended him for six months. *In re Cowdery,* 69 Cal. 32. The attorney who offered and paid the retainer was likewise suspended for the same period. *In re Whittemore, Id.* 67. In another case the respondent as District Attorney had drawn an indictment which had been found a true bill by the grand jury. Seven years later as attorney for the defendant, he successfully moved to set aside the indictment. In that he was not assisted by information received in his capacity of District Attorney. The court said: "Neither his ignorance of the law, nor the crudity of his notions of professional ethics, can excuse an offense against professional propriety by one whose duty it is to assist in the administration of justice. The degree of turpitude involved in the breach of his duty by an attorney, however, must appear in the circumstances of each case. The punishment which should follow an inadvertent or ignorant departure from professional propriety—no seriously evil consequences having resulted—should be less severe than where the offense is a deliberate or corrupt violation of official oath. The circumstances presented by the record, while they go towards showing an absence of intentional wrong, do not justify respondent. However innocent his motives, his conduct must be condemned." He was suspended for three months. *People v. Spencer,* 61 Cal. 128. In *Price v. Grand Rap. R. R. Co.,* 18 Ind. 137, the circumstances resembled to a certain extent those in the present case. The defendant had employed one attorney to whom alone he was willing to trust his cause, but other persons interested in the question employed another attorney to act as associate counsel. The defendant accepted the services, treated such associate counsel as his, consulted with him and he

took part at the trial. Such counsel acted for the plaintiff on a second trial of the case four years later. The court said, referring to the first trial: "Beyond doubt, in this state of facts, he is to be regarded as having been the attorney of" the defendant "equally as though he had been feed by him." A new trial was granted for error on the part of the lower court in not excluding the attorney from acting for the plaintiff on the second trial.

In the case of Mr. Thompson, after making all due allowances for the looseness of the relationship of attorney and client between him and Mr. Sumner, and giving him all the benefit of doubt that reasonably can be given as to the extent of his knowledge as to the understanding of the parties, especilly Mr. Sumner, at the settlement, and taking into consideration his comparative youthfulness (though he disclaims any desire for allowances on this account), the fact that, as appears from the evidence, he acted to a large extent under Mr. Humphreys' directions, and the good reputation that he has borne in the community, we do not see how, consistently with our duty under the circumstances, the penalty can be less than suspension for one year. In the case of Mr. Humphreys the penalty on the charges thus far considered should be no less than in the case of Mr. Thompson, but a graver charge is made against Mr. Humphreys individually, that of attempting to persuade Mr. Magoon to betray his client, Mr. Sumner, which will now be considered.

On the day after Mr. Sumner, in company with Mr. Magoon as his attorney, drew the balance of the money, $48,025, from the Bishop, Mr. Humphreys called at Mr. Magoon's office, and the following took place, according to Mr. Magoon's testimony:

"Mr. Humphreys came into my office and said he wanted to speak to me on a matter of grave importance. I gave him an audience. I think we were closeted alone in the room. He told me it was the Sumner matter, he said he had been told that I had withdrawn or assisted Mr. Sumner in withdrawing money

from the Bishop and depositing it in the Bank for Mr. Sumner. He gave me a letter which he said he had sent to Bishop & Co. * * * He stated that it was an improper thing for me to have done, to have withdrawn this money, but he said that he wanted to settle the matter—that he did not—said that he would make an offer of compromise which would be satisfactory to all concerned he thought and his suggestion was—he offered that the Ellises take $30,000 and Mr. Sumner take the rest, $18,025. I told him that was not a fair compromise, in fact wasn't a compromise at all and that I could not recommend it to my client. Still he said, the old man Sumner was going to Tahiti, he would not want very much money, would spend it all, it would be enough for him. I said I thought not, I didn't think it fair that the Ellises should take the whole $30,000 and give Sumner $18,025, that didn't seem to be fair. He said 'You don't care anything for Sumner, what do you care for Sumner? Let him go. What do you care, what do we care if we can get our fees out of him. They will spend the money anyway.' I still persisted and said I did not think it was right, I did not think Mr. Sumner will agree to it. He said he would agree to it if I would advise it. I said I could not advise it. Finally he said, 'If this settlement is agreed upon I can charge the Ellises $5,000 for my services,' and that I might charge $3,000, * * * I could get $3,000 out of it and that he could get $5,000; that was we cared for, that was our fees. And I said, no, I could not do it. Then he said, 'Well, you think it over, you think the matter over and talk it over with Mr. Sumner and let me know.' I said 'Well, I will do it,' I would submit the matter to Mr. Sumner anyway. * * * He said that he would bring suit on behalf of the Ellises unless this matter was compromised, bring suit on behalf of the Elises, bring suit to regain this money, as he had notified Bishop & Co. that he would do. I said, that was all right, go ahead. He said, 'And I will see to it that Sumner will never get a dollar of it. I will keep this in Court until after Sumner's death. He never shall have a dollar of this money. If I am beaten before the Circuit Court, and I don't think I shall be, I shall take it to the Supreme Court, the Supreme Court of the Territory and if I am beaten there I shall take it to the Supreme Court of the United States. I shall not be beaten by anything. I will keep it in litigation

so long as Sumner lives.' I said, 'You cannot do that, take it
to the Supreme Court of the United States. There is no federal
question involved. You cannot take it to the Supreme Court of
the United States.' 'Oh,' he said, 'You can make a federal ques-
tion in any case. You can raise a federal question in any case,
pretty nearly in any case you could get it in, it doesn't make
any difference what it is, whether it is valid or not, you can take
it to the Supreme Court, and I will see that it is kept in litigation
as long as Sumner lives and that he will never get a dollar of it.'
*   *   *   * Before he went away he said I must not say any-
thing about fees, he spoke to me confidentially. 'We must keep
that between ourselves.' " .

Afterwards, Mr. Magoon, having seen Mr. Sumner, went, as
he testifies,

"to Mr. Humphreys' office on Bethel street and told him
that I came for the purpose of ascertaining whether some rea-
sonable settlement could not be made. I said that the settle-
ment 'you' propose is out of the question and he did not let me
finish, he stopped me before I finished, saying what I had to
say. He said, 'well now, if you have come for a settlement I
want to have you understand that I will not take anything less
than $30,000. I will not take $29,999.99. I want $30,000 or
nothing.' I said, 'Well, if that is the way you feel about it there
is absolutely no use for us to talk. I don't want to waste your
time nor mine,' and I turned round and left the office without
any further talk."

Mr. Humpheys' version is as follows:

"I then said to these people (the Ellises), arranged with
them for getting a $1000 fee for this money. I knew Mr.
Sumner's age, about eighty-five years of age. I said—I was
reasoning to myself—I said, here is $48,000, call it $50,000.
Invested at 6%, would make $3,000, a fair rate of interest on a
trust fund, $3,000 per annum. Mr. Sumner's life expectancy
cannot in the nature of things exceed five years. That
would leave him $15,000 from the $48,000, $3,000 a year.
$30,000 would go to the Ellises. I thought the $3,000 would
be used in effecting a settlement, believing at that time, not
having seen the trust deed, that the trust might be terminated.
I made the contract on the basis of $30,000 and they paid me
cash, a fee of $1,000. After leaving Bishop & Co. with this

letter, I met in front of the Post Office, Clinton J. Hutchins. I asked him what would be the expectancy of a man about eighty-four and he said three and a fraction years. I had granted Mr. Sumner five years, not having any table at hand. Mr. Hutchins said it would be three years and a fraction (8-10). I went from there to the recorder's office and made a pencil copy (of the trust deed) which was afterwards typewritten by my stenographer. Returning from the Recorder's office I stopped in at Magoon's and informed him of the letter which I had written to Bishop & Co. He asked me if I had a copy of the letter and I told him that I had and that I would send it to him during the day, which I did. I asked Magoon for the will. He says—I said, 'This will has been delivered to you, I would like to see it.' My recollection is that he said it was destroyed. He either said cancelled or destroyed. I might have construed the word cancelled, thought it convertible with destroyed. He denies that he said it was destroyed, he says he said it was cancelled. Probably that is true. It is more than likely that he used that term and I understood by that that it was destroyed. He then asked if there was a possibility of a settlement. I told him that there was—of Sumner's life expectancy, of the conversation I had had with Hutchins and my own expression. Well, take it at five years, that would be $15,000. There will be $3,000 left over for chips and whetstones. I did not propose to Mr. Magoon that I would charge $5,000 and he could charge $3,000, nor did I propose to charge my clients $5,000 because I had made a contract which had already been paid, for the services which were contemplated."

These two versions are flatly contradictory in the parts which are now of chief importance. They cannot be reconciled on any theory of misunderstanding or failure of memory. Which witness should be believed?

So far as interest is concerned Mr. Humphreys has almost as great an interest as it is possible to have to avoid the natural consequences of Mr. Magoon's testimony. Mr. Magoon's only interest, so far as can be contended, is to get even with his brother-in-law, by practically ruining him, because of the abuses which the latter has heaped upon him in the Ropert case. The

contention is in substance that the respondent has practically disqualified the witness against him by taking pains to give him cause for retaliation. It is hardly likely that Mr. Magoon would deliberately and premeditatedly concoct a story of this sort for the purpose of inflicting such dire results upon one in Mr. Humphreys' position. There was nothing in Mr. Magoon's attitude or testimony to indicate that he was falsifying. And, as for feelings of animosity or ill-will, none were manifested on the part of Mr. Magoon, while scarcely more could be shown on the part of Mr. Humphreys. Mr. Magoon no doubt felt deeply grieved at Mr. Humphreys' unjust abuse of him in the Ropert case. If he had not, he would scarcely have been human. But throughout the Ropert case, so far as we can see, he refrained as far as he could from introducing questions of differences between counsel. When he reflected on opposing counsel it was only in so far as he had to adduce facts and argue from them in the interest of his client. He did not go out of his way as did Mr. Humphreys to attack counsel. He restrained himself as well as could be expected, considering the provocation. But we are not obliged to rely solely on the appearance and attitude of the witnesses on the stand, nor on their respective personal interests. There is much that tends to support Mr. Magoon as against Mr. Humphreys.

The respondents in their answer in these proceedings as well as in their testimony take the position that all offers of compromise in the Ropert case came from Sumner's attorneys, and Mr. Humphreys in his testimony above quoted says that the offer to compromise on the occasion now in question came from Mr. Magoon. As a matter of fact, with the exception of the instance above shown, when Mr. Magoon after he had seen his client at Mr. Humphreys' request, went to the latter, to see if some reasonable compromise could not be effected, was steadfastly opposed to compromises throughout. This is established beyond a doubt by the witnesses on both sides. Mr. Magoon's associate, Mr. Davis, apparently was eager to compromise and Mr. Magoon had to resist his importunities as well as those of

opposing counsel. There was much negotiation for a compro-
mise later on. The proposition, which may have originated with
Mr. Davis, was to settle by Sumner's paying the Ellises be-
tween $10,000 and $15,000. The furthest that Mr. Magoon got
was to yield against his will, at the desire of his client, Sumner,
to a proposition to pay $12,000, but he successfully held out
against the respondents' insistance on $1,000 more to cover
their fee, and thereupon the negotiations ceased. The fact
that Mr. Humphreys calculated the amounts and consulted an
insurance agent on the basis of Sumner's expectancy of life,
before going to Mr. Magoon's office, also shows pretty clearly
that he went there for the purpose of proposing a compromise.

The nature of Humphreys' conversation on the occasion in
question, as one of the threats and bluff, is corroborated by his
attitude throughout. In the first place, there is much reason to
believe that his proposition to take $30,000 for the Ellises was
not made in the best of faith or as a propostion to be considered
on its own merits alone. We need not consider what Mr.
Humphreys already knew as to the understanding at the pre-
vious settlement. Nor need we more than advert to the fact
already mentioned that Mr. Humphreys was later willing to
accept $13,000. He attempts to make a plausible case on the
basis of Mr. Sumner's life-expectancy. He does not, however,
consider that of the entire $110,000 Sumner had not received
a cent, other than the $48,025 then in question, or that $62,000
had already gone, or that the Ellises had already received
$30,000. He accused Mr. Magoon of having done an improper
thing and said that he would get into trouble because he had
assisted in obtaining the money from the trustee and that with-
out first examining the trust deed, although the trustee as well
as Mr. Magoon's client considered that the latter was entitled
to the money, which, as the court afterwards held, was the fact,
and Mr. Magoon had suggested to the trustee that he consult his
attorney, Mr. Stanley, before paying over the money. And
yet that was just what Mr. Humphreys' firm had done. They
had assisted in taking out $62,000 without looking at the trust

deed. Mr. Humphreys, it is true, says that he would not have taken his $2,500 fee at the time of the settlement without examining the trust deed, but he did not suggest to Mr. Thompson to examine the deed when the latter told him of the proposed settlement and he was ready enough to share in the fee after it had been paid, without examining the deed. Again if Mr. Humphreys had known the contents of the will, which he contends was made a part of the deed by reference, he would have known that by the terms of the trust the Bishop (for the church and St. Louis College) was a beneficiary remainderman after Sumner's death to the extent of one-fourth of the trust fund absolutely, and that each of the Ellises was a beneficiary remainderman to the extent of one-fourth only for the life of the survivor of them, and that subject to certain conditions. Mr. Humphreys says that he had not seen the will, though he says that he had previously had a general knowledge of its contents. But he did not think it worth while to ask Mr. Highton as to its contents although the latter had told him seven weeks before that he had examined it, nor did he think to inquire of the trustee or the latter's attorney who would be likely to have known the terms of the will. But Mr. Humphreys says that he had, on his way to Mr. Magoon's on that day, copied the trust deed from the public records. He therefore knew its contents. That, apart from the will, showed that Sumner's heirs, then, of course, unascertained, were the remaindermen, and Mr. Humphreys knew that Mrs. Davis was an heir apparent to Sumner to the same extent as the three Ellises together, and yet she was left out of his calculations.

In the next place, Mr. Humphreys' attitude was one of threat and of harassment of Mr. Magoon throughout. He began with a tirade against Magoon in the answer which he drafted for the Ellises in the Ropert case. To use his own concessions on the witness stand, "a great deal of it (the answer) is impulsive and immaterial, impertinent matter." Speaking of a particular portion of the answer, he concedes that it "is an abusive statement." In this connection reference may be made to an allega-

tion in the complaint to the effect that Mr. Humphreys did not
sign the answer as counsel because he knew that he could not
properly appear against Sumner in that case.    We do not find
this allegation sustained.    We believe Mr. Humphreys' ex-
planation, which, we may add, is corroborated by Thompson and,
Watson.    He says that just before drafting the answer he told
Mrs. Humphreys of his intention and that she deprecated the
idea of making charges against Magoon, in view of her relations
to Mrs. Magoon, and that, out of deference to her wishes, he
suggested to his partners that they alone sign the answer, which
they did in their separate names as "solicitors," but that soon
after it struck him, Humphreys, that "it was an inconsistent
thing to do," that it looked "like shooting from ambush, as dis-
ingenuous."    Thereafter he appeared on record, signing his
name separately as "of counsel."    He was the leading counsel.
in that case and throughout, both below and in this court, his
attitude was one of the extreme bitterness and asperity towards.
Mr. Magoon.    It seemed as if the greater part of his lengthy ar-
gument in that case in this court was directed against Mr. Ma-
goon rather than for his own clients, and after asking in this
court for an immediate investigation of the conduct of all
counsel in the case and acquiescing in a reference of the matter
to the Attorney General by this court, he neglected and de-
clined to make any statement in response to the written request
of that official.    In his argument in the present case, and this
is equally true of Mr. Thompson's argument, he went to a
length deserving of severe censure.    Both respondents were
allowed unusual liberty in their arguments in view of the pecu-
liar position in which they were placed.

Reference may be made to some particular instances showing
Mr. Humphrey's threatening attitude, some of which occurred
outside of the court.    Mr. Wundenberg, who is connected with
Mr. Magoon in business, says that on one occasion,

"Mr. Humphreys came to my office and made this remark,
something to this effect, that he was tired of talking to Mr. Ma-
goon and he addressed himself to me, and, as my recollection

goes, it was as regards the filing of some instrument in the case with Sumner. He stated that if that was filed he would file an answer that would raise the roof off the Magoon building and part of the Judiciary Building," and, on cross-examination, he says, "it struck me as a threat, if Magoon did certain things, you would do certain things."

Mr. Humphreys says that Mr. Wundenberg's statement is substantially correct, that the document referred to by him, Humphreys, was the Ellises' answer in the Ropert case, and that that was the way he felt. Mr. Lightfoot, an attorney associated with Mr. Magoon in practice, testified:

"I had been, I was working in the library and Judge Humphreys was also working there, and and having finished our work we began to speak about the Sumner case as it was called, meaning the case of Ropert against Sumner. Mr. Humphreys stated that he did not care particularly how Judge De Bolt should rule in that case, that if it were not for the fact that it would be considered a discourtesy by him towards the court, he would not even argue the case . Mr. Humphreys further stated in very emphatic terms that he was confident that he would win out before the Supreme Court of the Territory of Hawaii and producing a large number of gold coins from his pocket, offered to wager with me that sum against a small sum that he would so win. Mr. Humphreys further stated that in the event he (Humphreys) should be defeated in the appeal— in the appeal to the Supreme Court of the Territory.of Hawaii, in case such an appeal would be taken, he would further appeal to the Supreme Court of the United States of America and that John K. Sumner would never see—never live to see the end of the litigation."

Mr. Humphreys does not dispute this, but contends that he was in earnest and felt confident that he would win, and that he, as Mr. Lightfoot also says, mentioned the possible disqualification of two members of this court as a basis on which to raise a federal question. In February, upon Mr. Magoon's having said to Mr. Humphreys' partner, Mr. Watson, that he intended to move in this court that the Ropert case be advanced on the calendar, Mr. Humphreys, referring to the proposed affidavits

in support of the motion, wrote to him: "Go ahead and file your affidavits and we will meet you with counter-affidavits, and we think we have a surprise in store for you." The surprise related to a trust deed which had been executed by Sumner to R. W. Davis after the Ropert suit had begun, covering a portion of the fund in dispute. There certainly could be no objection to Mr. Humphreys being confident of his case or to his intention to appeal it from one court to another, if necessary, as long as any appeal would lie, if such were the facts, nor to his expressing himself to that effect in terms as emphatic as he pleased. Even an attempt at a game of bluff resorted to in his ardor for the interests of his clients might, at least if within certain limits, be overlooked. That is not the question. The question is whether his conduct as a whole in this direction, especially considering its groundlessness and, we may add, Mr. Humphreys' prior friendliness to Mr. Magoon, does not tend to corroborate to some extent, and we think it does, Mr. Magoon's testimony as to the attitude of Mr. Humphreys at the interview on the 22nd of October. At that time they were on exceedingly friendly terms, as they both testify. They called each other by their first names. Mr. Humphreys and his family visited Mr. Magoon and his family at the latter's country places at the beach at Kaalawai and in Nuuanu valley. They were brothers-in-law.

Reference will now be made to particular matters upon which this respondent relies to show that Mr. Magoon perjured himself. We have already mentioned his contention that Mr. Magoon must have felt revengeful towards him in consequence of his abuse of him. Another point relied on relates to the matter now in question. It is that Mr. Magoon was not particularly impressed at the time of the conversation in question that Mr. Humphreys' proposition was dishonorable. It may be that Mr. Magoon's sense of professional ethics was not of the highest or at least that Mr. Humphreys did not so regard it. If the latter had so regarded it, he would not have thought of making

such a proposal to Mr. Magoon. But this much may be said, that, as already stated, the two were on most intimate terms, and naturally Mr. Humphreys on the one hand would think himself safe, especially if he thought Mr. Magoon a little weak in this direction, and Mr. Magoon on the other hand would not be so likely to express resentment at the proposal. As a matter of fact he persisted that, while he said that he would mention the matter to his client because Mr. Humphreys requested it, he could not advise his client to accept the proposition. That it did not strike him as glaringly improper to the extent that it ought to have, does not show that he falsified in his testimony. If he were bent, as the contention is, on procuring Mr. Humphreys' disbarment, to such an extent as to fabricate his story out of nothing, he could easily have made it worse, and certainly could have expressed greater disapproval of Mr. Humphreys' conduct. The following from Mr. Magoon's cross-examination shows how he did express himself on this point.

Cross-examination by Mr. Humphreys:

"Q. I told you I would charge $5,000? A. You did. Q. Also that you could charge $3,000? A. You did. Q. You looked upon it as unconscionable, did you not? A. Unfair. Q. Do you look upon it as dishonorable? A. I did not at the time, I did not think it was dishonorable so far as you were concerned. I did not know what motive was there. Q. You did not show any resentment, did you? A. I did not. Q. Did you suggest the impropriety of the proposal—that it was an improper proposal for me to make you? A. I did not * * * Q. I asked you to keep this matter secret? A. You did. Q. How did that suggestion impress you? A. As to keeping secret? Matter of fact. Q. You say you did not regard it as improper? Now I suggested that you charge what you considered an unfair fee and that I take for me what you thought an extortionate and unconscienable sum? A. I never said it. Q. I asked you to keep it secret. Was that inconsistent with candor, honor and professional propriety and fidelity to my client and your client? A. In the first place I could not charge a fee of $3,000 without my client knowing it and you could not charge a fee of $5,000

without your clients knowing it and if your clients, if you wanted to charge them $5,000, as far as I was concerned, I did not care to keep it secret, but you wanted it kept secret, so I said nothing. Q. In connection with my asking you to keep it secret it didn't impress you that I was pursuing a course of dishonesty? A. I did not give it a thought one way or the other. I should not charge a $3,000 fee for the work I had done. You said I could do so but that didn't make any difference to me. Q. You have testified disparagingly of the proceeding, you have testified on the theory that it is relevant and that it tends to impeach me as a member of the bar. I ask you why you didn't think so at the time and now think so? A. I didn't say I now think so."

Cross-examination by Mr. Thompson:

"Q. Now, Mr. Magoon, when Judge Humphreys made the proposition to you to settle for $30,000, he to receive a fee of $5,000 and you to receive a fee of $3,00, you regarded the proposition as unconscionable? A. Yes, I did. Q. Just a moment until I get through and we will get along more rapidly. A. Excuse me, I thought you had finished. Q. And refused to accept it and said yesterday that you would not have charged a fee of $3,000 if you had settled the matter? A. I did and I say so still. I do think it is absolutely unconscionable and unreasonable to get parties to compromise like that and then charge a fee of $5,000 for it. There was no litigation in court, nothing to do, but simply come up to my office. It was outrageous and besides it would leave Mr. Sumner only $18,000 and I take $3,000. Now, how much fee did you receive in the settlement of Maria S. Davis? A. I received $2,500. Q. What did you do in that settlement? A. I did nothing in the settlement, but one time I had an interview with you. That is all. How much did Mr. Davis get? A. I don't know. Yes, I do. I don't know how much got. I know how much he said he got. Q. How much was it? A. He was to get $5,000. He gave me half of his fee. He told me he would. Q. You got one-third of $15,000? Mr. Magoon and Mr. Davis meaning the team who worked together, you and Mr. Davis got one-third of $15,000 as a fee for it but one-sixth of $18,000 was unscienable? A. No, in one case it was merely a bluff as I construed it, absolutely, demand, stand-up, hold-up of Mr. Sumner, to pay

$18,000 without my reason, right, justice or any equity about it and to charge $5,000 for work of that sort certainly without doing a thing excepting come into my office, I think is unconscionable and outrageous. Q. Didn't you say yesterday that you saw nothing improper in it and did not so regard it? A. So far as anything criminal I saw nothing improper in it. Q. Then— A. Let me finish. There was nothing you could charge Mr. Humphreys with as criminal, but so far as the proprities, so far as the reasonableness of it, I said yesterday I would not take $3,000 if I had compromised that matter as a fee. Q. Then impropriety with you means only criminalty? A. Well it might be, I don't know about that. Q. Didn't you say yesterday, you saw nothing improper in it and that you submitted it to your client? A. In that sense I had to submit it to my client. I said to Mr. Humphreys—as you have—as he came to me there was nothing improper—I said, 'Mr. Humphreys, I would refuse to recommend it to my client.' He said, you think the matter over and then let—me know. Q. Did you say that yesterday, that you refused to recommend it? A. I think I did. I think I said so; I am pretty sure of it. Q. But you did say yesterday that there was nothing improper in it and you did not think so. A. What I had reference to in improper proposal in the matter, he made no attempt to pay me any part of his fee. It was in the nature of a threat. He said to me, 'You have been doing an improper thing. You are going to get yourself into trouble here. I am going to bring suit, I am going to expose it.' I said, 'All right, go ahead.' That didn't phase me at all. Then he said he would prolong litigation, we could get nothing out of it during Mr. Sumner's life time, I would not get anything. That propostion to compromise. There was a certain thing—I was under obligations to him, he has been to my house any number of times, we were friendly, I had treated him as such, we had been on most intimate terms, I had done everything possible. He said he would get $5,000 if I could—if I would consent, I would benefit him $5,000 and could get $3,000 myself. I simply said, 'No, I would not, I could not do it.' I would rather submit the proposition to Mr. Sumner, but I was sure he would not talk. Q. How Judge Humphreys came to you with a blackmail, a bluff you call it— A. I considered it a bluff. It is a proposition to blackmail, but he might have

thought that he had a good show. He said, 'I will beat, beat. You haven't a show. I am confident I can beat it in the Circuit Court. I will beat you and you'll never get a dollar of it.' Q. Did he threaten to verbally chastise you, didn't he? A. No, he didn't. 'You are going to lose; the matter is coming up,' he said. Q. The proposition to blackmail your client didn't offend you? You saw nothing improper in it? A. The way I looked at it, there was nothing to blackmail. Q. The way you looked at it? Oh, point of view. I want— A. Here is a man I had been on the most intimate terms with. I didn't want to consider it in the light of blackmail. He didn't consider it so. I did. As far as the circumstances I considered it in the light of blackmail. Q. Yet you swore yesterday he considered it proper? A. If he thought it was proper he had that right. Q. Were you swearing to Judge Humphreys' opinion yesterday or your own? A. I didn't see anything in his making a proposition if he thinks it right. To him it was all right. As far as the proposition, it was an outrage. From his standpoint it might be proper. From my standpoint it was absolutely improper. He didn't bribe me in any way—didn't say he would give me a part of his fee. 'You can charge $3,000 in this matter. Sumner will spend the money. You don't care anything about Sumner. What do we care for him?' Q. And all that you did not deem improper and take any offense at? A. How could I take offense at it?"

There were several collateral matters relied on as tending to show Mr. Magoon's alleged incredibility. One relates to a certain power of attorney from Sumner to Magoon and a certain deed from Sumner to R. W. Davis—which were drafted in Magoon's office during the pendency of the Ropert case. The real object in going into this matter apparently was to show that Mr. Magoon had himself acted in an improper manner, and especially that he had attempted a fraud on the court but, that failing, an attempt was made to show that he falsified as to the nature and contents of those instruments. The attempt was to contradict him in those respects by the testimony of the notary public who took the acknowledgments to those instruments. But practically the only difference brought out was

that Mr. Magoon thought that the power of attorney was a special power of attorney because, among other reasons, he could not act under it in any particular without first obtaining the approval of R. W. Davis, while the notary had entered in his book his classification of the instrument as a general power of attorney.   It is true, Mr. Magoon testified very reluctantly on those matters, but he kept nothing back when the questions were specifically put to him, and, of course, he naturally could see no reason why he should be questioned upon those instruments.    These matters were irrelevant.    The testimony was admitted on Mr. Humphreys' promise to connect it, which he failed to do.

Another matter replied on for the same purpose is a contradiction between Mr. Magoon and Mr. Humphreys in regard to a conversation in which one of them called the attention of the other to the fact that a certain affidavit had been filed in one of the Sumner cases some years ago, which, it was claimed, might be used in Washington to prevent the railroad company from effecting a compromise with the Federal government in regard to the title to the Sumner property involved in the railroad suit.    The most that could be contended on this point is that we have merely Mr. Humphreys' statement against Mr. Magoon's, and the fact that they contradicted each other as to that would not show that Mr. Magoon as against Mr. Humphreys falsified as to the proposition made to compromise on October 22.    But so far as the indications go we are not sure but that they favor Mr. Magoon.    There are several alleged points of difference in their statements.    One relates to the time when the conversation took place.    Mr. Humphreys says that it was August 18, the night of a certain fire.    Mr. Magoon says that it was when Mr. Humphreys spoke to him about going into the case, as to which Mr. Humphreys agrees, but that he does not remember whether the case (the railroad case) was already begun or about to be begun.    There is no contradiction there.    Another point relates to the place where the conversa-

tion took place. Mr. Magoon says that it was at his beach place at Kaalawai when Mr. Humphreys was visiting there. Mr. Humphreys says that it was on the ride to the fire from Mr. Magoon's valley place when he, Humphreys, was visiting there, and that he visited Kaalawai in April, long before the case was begun, though he does not say also that he did not visit there afterwards. According to Mr. Humphreys, he and Mr. Magoon had talked over the Sumner matter at length the evening before, he, Humphreys, beginning the conversation and having that subject much on his mind, and Mr. Magoon made the suggestion as to the affidavit when they were riding to the fire at about two o'clock in the morning. Mr. Magoon says that they were that night driving at a three minute gait down hill in darkness and that both were intent on the fire, each fearing that his own property was in danger, and that he himself had all he could do looking after the horse, and that he did not think the matter of the affidavit was mentioned during those ten minutes or less of excitement. Suppose the conversation did occur on that drive. That was merely a matter of memory as to the particular occasion when a conversation took place and did not affect the truthfulness of either witness as to what was said or even as to the occasion. Another and more important point of difference relates to who made the suggestion as to the affidavit. Each says that the other did. It seems that both were attorneys in the case in which the affidavit was filed, but that the affidavit was filed by the firm then consisting of Mr. Humphreys and another, and that Mr. Magoon, who was on the other side, had ceased to take a leading part in the case, other counsel having come in as leading counsel. The fact that the suggestion was to make use of the affidavit in Washington and that both witnesses agree that Mr. Humphreys was the one who mentioned Washington, and that the matter was on his mind and that Mr. Magoon had no thought then of coming into the case and that Mr. Magoon, when afterwards asked to come in on the other side, first telephoned to Mr. Humphreys

to see if he had any objections, in view of their previous con-
versation, tends to confirm Mr. Magoon. But, after all, what
difference does it make? It was at most merely a question of
memory, not involving a question of truthfulness on either side.
We have referred to it, and to the other matters under this
head, at such length merely because so much is made of them
by this respondent. The credibility of a witness cannot be
shaken in this way. It seems child's play to go into these col-
lateral matters involving mere questions of memory. If they
tended to show Mr. Magoon false to his oath, there are other
things that, on similar reasoning, would show beyond doubt
Mr. Humphreys' falsity. He has made statements which are
beyond question false, but which we have no hesitation in say-
ing he did not intend to make. They can easily be accounted
for on the theory of inadvertence or impulsiveness or reckless-
ness. As to how far he should be regarded as credible in gen-
eral, as shown by all the matters in the case, many of which
are set forth in this opinion, we need not say. The question is
not so much whether he is false as whether Mr. Magoon is to
be believed as to what he said as to the proposition of October
22. It is impossible to set forth fully in written detail all that
contributes to one's conclusion concerning the credibility of a
witness. We feel convinced that Mr. Magoon told the truth as
to the conversation that took place between him and Mr. Hum-
phreys on the 22nd of last October.

Mr. Humphreys, on the evidence, is guilty of having at-
tempted to induce Mr. Magoon to betray his client—an aged
credulous man easily imposed upon and of whom others, as
Mr. Humphreys knew, had previously taken advantage. In
order to accomplish this he urged considerations of personal
friendship, resorted to threats, and suggested large booty.
"What do we care for Sumner, yet him go, all we care for is
our fees." There is but one conclusion—disbarment. As Mr.
Justice Brewer said in the passage quoted in the first part of
this opinion: We "cannot tolerate for a moment, neither can

the profession, neither the community, any disloyalty on the part of a lawyer to his client. In all things he must be true to that trust, or, failing it, he must leave the profession." Attempting to induce another to betray his client is as bad as proposing to betray one's own client—perhaps worse. That was the position taken in the *Cowdery* and *Whittemore* cases above cited. The imposition of the penalty is not merely for the purpose of punishing the wrongdoer. It is even more for the protection of the profession and the public.

The judgment of the court is that the respondent Frank E. Thompson be and he is hereby suspended from acting as an attorney or counselor at law in the courts of this Territory for the period of one year from this date, and that the respondent A. S. Humphreys be and he is hereby disbarred, and that his name be and it is hereby stricken from the roll of attorneys and counselors of the courts of this Territory.

*Attorney General L. Andrews* and *Assistant to the Attorney General, P. L. Weaver,* in support of the complaint.

*Respondents* in pesron; *John W. Cathcart* also for respondent F. E. Thompson.

### DISSENTING OPINION OF GALBRAITH, J.

I am compelled to dissent from many of the findings made and the judgment pronounced in the foregoing opinion, although I do concur in the finding that the respondents were guilty of professional misconduct and impropriety in appearing against John K. Sumner in the Ropert suit after having appeared of record for him in the guardianship proceedings. However, I am not convinced that the respondents can be properly charged with turpitude for so doing. It is not found that there was any contractual relation existing between Sumner and the respondents or that the relation of attorney and client existed between them to its "full extent" and the evidence wholly fails to show that by reason of their connection with the

·guardianship case they obtained any secrets or special information that was used against Sumner in the Ropert case. There ·was no betrayal of confidence, for Sumner reposed no confidence in either of them, nor does it appear that they gained any ad·vantage in the latter suit by reason of their connection with the former.

The difference in opinion between the majority and the minor:ity of the court in this instance is due largely, I believe, to the difference in the conclusions drawn from the evidence. Still I do not consider it necessary to go into a minute analysis of the ·voluminious evidence in the record but shall content myself in a .large measure with a statement of the conclusions of fact that I believe should be drawn from the evidence so far as the same .may be considered material to the issue here presented.

It appears that Henry E. Highton was retained in the suit of the Railroad Company against the Bishop, as Trustee, and .John K. Sumner for specific performance of the option for the sale of the reef property, by the Ellises, prior to the return of Mr. Sumner to the islands, on August 20, 1902, and that this employment was ratified by Sumner shortly after his arrival; that Mrs. Buffandeau paid Highton $125 on his retainer fee of $500; that the relation of attorney and client did exist between Mr. Highton and the Ellises (and when I refer to the Ellises I mean to include Mrs. Buffandeau); that Mr. Highton advised the Ellises shortly after his employment that the will of John K. Sumner, referred to in the trust deed to the Bishop, was a part of the deed and that the deed was irrevocable and that the Ellises were beneficiaries under the trust therein created, and had an intrest in the property and suit; that Mr. Highton afterwards ·changed his mind on the revocability of the deed and concluded that the trust deed was revocable but he did not advise the Ellises ·of this change of mind; that on October 10, 1902, he wrote a letter to Sumner and the Ellises in which there was a rather veiled statement of his changed views relative to the trust deed and .also wrote an answer to this letter and procured it to be signed

by Sumner and the Ellises in which it was stated that they thoroughly understand his letter and that the facts therein contained were correct; that Mr. Highton did not advise his associate counsel for the Ellises, the respondents, that he had written such letters until long afterwards; that Mr. Highton, on September 4, 1902, acting for Sumner and the Ellises, had practically agreed upon terms of settlement of the railroad suit—then the only suit pending against Sumner—and for the conveyance of the reef property to the company on the payment of $102,500; that there was a meeting on that day at Highton's office and that Sumner and the Ellises and R. W. Cathcart were present and that prior to that date Sumner and the Ellises were very friendly; that there was a disagreement between Sumner and the Ellises as to the disposition of the money expected to be received from the railroad company; that while this meeting was in progress and as a result of the dissatisfaction of the Ellises with a proposition to place the expected proceeds of the sale of the property in trust for the benefit of the Ellises, W. S. Ellis telephoned for the respondent, Humphreys, who came over to the meeting and after being advised of the situation announced that he had been employed by the Ellises and as their attorney advised against the proposed trust and the sale of the property for the $102,500 for the reason that the property was worth much more money than that amount; that on the same day Humphreys and Highton went to see the attorneys for the railroad company to find out if a greater sum would not be paid for the property and the proposition was taken under consideration by the attorneys for the company; that afterwards, and during the night of September 4, the suit to place John K. Sumner under guardianship and the injunction suit to restrain the sale of the reef property were commenced; that Highton treated the Ellises as interested parties in all this litigation although none of them were parties to the record in any one of the three suits; that when service was made on Sumner in these latter suits the Ellises and Sum-

ner took the papers to Highton and Highton in turn took them to the office of the respondents for the purpose of a conference relative to the line of defense; that Humphreys refused at first to have anything to do with these suits but on being reminded by Highton that the Ellises and Sumner had a common interest as against the parties bringing these actions and that if Sumner was declared insane that would block the sale of the land and prevent the Ellises from realizing any part of the proceeds; that the respondent Humphreys then consented that the respondent Thompson might assist Highton in conducting the defense in the guardianship suit with the distinct understanding between the respondents and Highton that he did so representing the supposed interest of the Ellises; that the reason for the employment of the respondents on September 4, was the disagreement between Sumner and the Ellises over the disposition to be made of the proceeds from the sale of the reef property, the Ellises believing that the greater amount realized from the sale the more money they would get from it; that Highton prepared the answer in the guardianship suit and submitted it to the respondent Thompson who signed the firm name "Humphreys, Thompson & Watson" under that of Henry E. Highton as attorneys for John K. Sumner; that Thompson appeared in court during the trial of that cause with Highton, as one of Sumner's lawyers and was also active in negotiating the compromise that result in a settlement of the suits; that it does not appear that the respondent Humphreys knew that his firm name had been signed to the answer of John K. Sumner in that suit but it does appear that he had sufficient knowledge of Thompson's connection in the case to put him upon inquiry before taking the inconsistent position he did in the Ropert case. The respondent Thompson, of course, had actual knowledge of the part he had taken in the guardianship suit and that he had appeared therein as attorney for John K. Sumner, there was for that reason, less excuse for his appearance against Sumner in the Ropert case than for the respondent Humphreys.

Although this court found in the decision of the Ropert case that it was understood by the parties present and interested, at the so called settlement and partial distribution, at Mr. Highton's office, October 13, 1902, that the balance of the fund ($48,025) should go to John K. Sumner free from the trust, in the light of the evidence given in this proceeding I am not sure that that finding is correct. This question is material in this proceeding as it affects the motive of the respondents and should in a large measure determine the punishment to be inflicted.

Mr. Highton in whose office the transaction occurred and who was the senior counsel for all parties, neither wrote a letter to himself stating what the understanding of the parties was nor did he enter it in his diary—where, it seems, he keeps a record of his daily business transactions, but testifies that his "impression" is that it was a final settlement and so understood by all parties. He also said "He" (Sumner) "was determined that he would give them $10,000. I remember of one occasion he said, 'when you have lost your $10,000 I will have the remainder to give you something to eat.' " Sumner says that he understood that he was to be free of the Ellises and the Davises forever afterwards. Against this evidence is the testimony of every other person present, namely, the Ellises, the respondent Thompson and R. W. Cathcart. And in behalf of Mr. Cathcart I will state that he has no professional reputation to sustain in these proceedings and is apparently a disinterested witness and impressed me, in his manner of testifying, that he wanted only to state the exact truth. These witnesses are supported by the allegation in the sworn petition of Bishop Ropert, the trustee, in the Ropert suit, wherein after reciting the conveyance of the land for the consideration of $110,000 it is alleged "and thereafter by mutual agreement a portion of said sum of money was divided among the said Victoria Ellis Buffandeau, William Sumner Ellis, John S. Ellis and Maria S. Davis, leaving a balance in your petitioner's hands of forty-eight thousand ($48,025) dollars, *which it was under-*

*stood and agreed should be subject to the trust in said deed mentioned."*

It may be pertinent to inquire if this petition does not state the understanding of the parties why did not Mr. Highton in the letter directing the Bishop to pay the several sums agreed upon, also direct the payment of the balance of the money to Sumner? Why was it necessary for Sumner to employ J. Alfred Magoon to go with him to the Bishop to get the money? Neither of these questions have been answered to my satisfaction.

Neither the evidence in the record nor "inferences," however skillfully deduced from collateral incidents in the case, produces in my mind a belief that it was the understanding of all of the parties, at the October 13 meeting, that the "rest" of the money in the hands of the Bishop should go to Sumner free from the trust. The evidence rather justifies the inference that this was an afterthought—possibly suggested to Sumner after the meeting and payment to the other parties.

As to the allegation in Sumner's answer in the guardianship case that the property was Sumner's and he could do what he pleased with it and the repetition of that statement in Highton's letter, I do not attach any particular importance to either. Neither was a correct statement either of fact or law. At the time the answer was filed and the letter written Sumner did not own the property. It belonged to Bishop Ropert, as trustee, and had been so held since September, 1898, and the deed under which the Bishop held the property was on its face irrevocable. This court said on this question in the *In re* Humphreys decision *ante* p. 161, "the deed was *prima facie* irrevocable and it was only in view of extraneous evidence taken in connection with the terms of the deed that the court was led to its conclusion and as to whether such extraneous evidence was sufficient the court was divided." So at the time that answer was prepared and the letter written no careful lawyer could have advised that the deed was revocable and that the property

belonged to Sumner and that he could do what he pleased with it. He had already conveyed it in September, 1898.

I do not think it necessary in this proceeding either to vindicate the courage of any witness or to defend the prowess of the respondents. This is a side issue that may be properly relegated to the "ring side." I respectfully decline to act as referee on such a question.

Looking at the facts from the respondents' view point, and that is the view point the court should assume in passing on the propriety of their conduct in the presence of the court, it is not surprising that the respondents should have shown some feeling towards Henry E. Highton and J. Alfred Magoon. Since from such view point the former had been guilty of gross duplicity towards them and the latter, during the hearing, was firing on them from ambush. Why should not the respondents "shell the wood" for Magoon? It was J. Alfred Magoon who filed the charges with the Attorney General and who at the hearing, not in the open but "from the side line," was furnishing the greater part of the evidence introduced in support of the charges, after he had procured from the Attorney General a certificate of the rectitude of his conduct in the Sumner litigation. I do not condemn them, under such trying circumstances, for the acrimony exhibited. Nor do I believe that they abused the privilege of free speech that should be allowed attorneys when defending before the court charges so seriously affecting their personal and professional reputations.

*Prima facie,* the Ellises were beneficiaries under the trust deed and will of John K. Sumner and had an interest in the property and any suits affecting it or him. They had a right to employ counsel to protect this interest. They did employ the respondent and the respondents were faithful to their interest throughout the litigation. The serious mistake the respondents made is that they became attorneys of record for John K. Sumner in the guardianship suit and in the Ropert case, a related suit, they were against him. This is a position that no lawyer should permit himself to be placed in.

I concur in the finding of the court that under the law there is no difference in the degree of guilt of the respondents on this charge—they both are equally guilty although one had actual and the other constructive knowledge.

While the individual charge against the respondent, Humphreys, and of which the court finds him guilty, namely, of "attempting to pursuade" J. Alfred Magoon to betray his client, John K. Sumner, is a very grave one, I find great difficulty in considering it seriously on account of the character of the evidence by which it is found to be supported.

Judge Cooly said of a disbarment proceeding, "While not strictly a criminal prosecution, it is of that nature, and the punishment, in prohibiting the party following his ordinary occupation, would be severe and highly penal." (*Matter of Hamilton Baluss,* an attorney, 28 Mich. 507, 508.)

The Supreme Court of Illinois held that in order to disbar an attorney, "The case must be clear and free from doubt, not only as to the act charged, but as to the motive." (*People v. Harvey,* 41 Ill. 277-8.)

It has been held in California that to disbar an attorney is to "deprive him of personal and property rights. Unless we are clearly satisfied of respondent's guilt we ought not to remove or suspend him from the practice of his profession." (*In re Luce,* et al., 23 Pac. (Cal.) 350, 354.)

The only direct evidence in support of the charge is the testimony of the witness J. Alfred Magoon. He is flatly contradicted by the respondent Humphreys. The court finds that the former is sustained by certain collateral incidents and inferences, and that the respondent is discredited in like manner and finds that the charge is sustained. One of the reasons given for believing Magoon and disbelieving Humphreys is that Magoon could easily have made the story "worse." Again it is found that Magoon had no motive to falsify and that his manner on the stand was such as to indicate that he was only performing an unpleasant duty.

In considering this question I cannot overlook the fact that: the charge against the respondent is made by Mr. Magoon and that he did not make the charge for amusement and that having made it he would like very much if it were sustained.

To me, Mr. Magoon, as a witness in this case, assumed two different and distinct attitudes, one that of the ready and willing witness with a fairly good memory, the other that of the halting and unwilling witness with bad memory.

In order to illustrate these different attitudes I am compelled to quote from the transcript, and I hesitate to do this for the reason that I know the transcript to be inaccurate in some respects and it may be in others.

The witness appears in the first attitude when testifying to a conversation with a guest at his home some months before.

"But I knew when my attention was first called to it by Mr. Humphreys. It was at my place at Kaalawai, round Diamond Head, where Mr. Humphreys was staying with me. Q. When was that, in what month? A. I don't remember the month, it was while he was still on the bench. Q. What conversation was had between you and Mr. Humphreys at that time, Mr. Magoon? A. He stated to me in talking about the matter that there were proceedings taken or to be taken and that he had been approached and could be called into the case if he wanted to be in it. Q. Representing whom? On what side or what case, please? A. The case was to be brought by the Oahu Railway & Land Company against Ropert, Trustee, under the deed of trust to enforce the conveyance of the property to the company under the lease. We talked the matter over quite generally. He said at that time that he knew of a matter which he thought was a good defense to the action or would be beneficial to the trustee and that was with reference to the affidavit which Mr. Dillingham had signed when the lease had been executed, Mr. Dillingham signed an affidavit which appears of record and which I had forgotten about until he called my attention to it; that in getting—having the lease—in having the option to the lease call for the conveyance of all the land when Mr. Sumner only owned a half of it; Mr. Dillinghom had filed an affidavit that he knew that the title was in Mr. Sumner only to half of the land and therefore he could not oblige Mr. Sumner to give

him a good deed or good lease to more than half. That recalled the matter to my mind, which I had forgotten, and in talking over the matter I said I didn't see why he could not take it, take the case. He was about to go off the bench and I told him I did not see what objection there was to his coming into the case, if he went off the bench, in behalf of Mr. Sumner. He said he did not know as there was any objection to it, that he would be called in the case."

Also the following:

"George A. Davis, desired me to assist him in the case which was then pending before Judge De Bolt. Upon reeciving that information I telephoned to Mr. Humphreys, because the matters which we had talked about I considered confidential and private and I telephoned him to see if there was any reason why I should not be called into the case. Q. What was this case that you were to be called in? A. I didn't know what the case was. I was informed that there was a case on trial affecting Mr. Sumner's interest, I didn't know what it was. I was requested to appear, I think it was in the afternoon, about 1:30 I received the message from Mr. Davis, verbal message from Mr. Lightfoot,—I had not seen Mr. Davis,—to the effect that I was to be called into the case to assist him. I didn't know anything about the status of the case at that time. I didn't want to take it, I didn't want to take hold of it without referring to Mr. Humphreys to see if there was any objection to my going on. Q. Going on into the case? A. Going on into the case. I telephoned him to know if there was any reason, because of the matters we had talked about, against my going into the case. He said he had no objections whatever, that was over the telephone. I came into the court room here and sat beside George A. Davis and he made a request accordingly to enter me as associate counsel with him. That was before Judge Robinson. I declined and said I would only sit there during the afternoon and prompt him as to certain matters within my knowledge and that I would decide whether I would come in the case later. Q. Who was conducting the case on the other side at that time? A. Mr. Highton and F. E. Thompson were conducting th ecase. Q. What was that case? A. Next morning I looked at the records and found out that it was the application or effort of Mrs. Maria S. Davis to put Mr. Sumner under guardianship

as a person *non compos.* I didn't know that until I looked at the record next morning."

The second attitude is illustrated in the evidence of the same witness testifying about a power of attorney executed to himself, at a later date than either of the events above referred to, as follows:

"Q. Had Mr. Sumner at any time executed a power of attorney to you? A. I think that he executed a paper to me about that same time, a little prior to that general power of attorney. Q. Well, what was it? A. A special power of attorney, authorizing me to do certain things for him. Q. What, for instance? A. I cannot remember. Q. Did it authorize you to sign checks? A. I don't remember the contents of the power of attorney. Whatever my action was it was to be approved by some other persons. I didn't have any power to do anything of my own accord. Q. Who was the person? A. R. W. Davis. Q. Wallie Davis was a client of yours? A. I don't know whether he was particularly. Q. Can you say—can't you saw whether he was or not, particularly or unparticularly? A. I don't know what proceedings he was a client of mine in. A. You can state whether he was a client or not. A. I have done work for him. I have had no retained. When he had things to do he has come to me and to George A. Davis, I don't know that he was a client of mine. Q. Have you the power of attorney now? A. I have not. Q. Can you say what has become of it? A. It was returned to Mr. Sumner. Q. When? A. I don't know. Q. Didn't you return it to Mr. Sumner after you found out I knew you had it? A. I don't know. Q. I ask you whether or not this power of attorney authorized you to sign checks in Sumner's name? A. I think not. Q. What did it authorize you to do? Being the subject you must have some recollection as to its contents. A. I think it was in contemplation of Mr. Sumner going to Tahiti, he left me power to act upon request or approval of Mr. Davis. Q. Did you— act in what matters? A. In all his matters. Q. Then it was a general power of attorney? A. No, I could invest his money for him. Q. So that he didn't desire to take his money to Tahiti, he proposed to leave it here for you to invest? A. No, he wanted to take some of it and the rest he wanted to leave. Q. How can you name one single thing you were authorized to do by that power of attorney? A. No, I don't remember

any special thing—to attend to his business except—certain of his business, subject to the approval of Mr. Davis. Q. You say certain of his business, you must remember what business it was. A. To invest his money, as I remember. Q. To invest his money you would have to release mortgages, to invest money you would have to foreclose mortgages, let me refresh your memory to that extent; what other power did Sumner in this power of attorney confer upon you other than investing money? A. I don't remember, I think collect rents and invest his money. That is all. Q. You have stated you could not recollect anything and you subsequently stated, to collect rents. Can't you state something further as to the particulars of what it was? A. I don't remember. Q. Bring suits? A. I think so, yes. Q. Defend suits? A. I think so, yes. Q. Deposit his own money in your name? A. I don't remember anything said with reference to that. Q. Was there anything said in the power about the disposition of money after you had collected it? A. I don't remember. Q. Was your commission fixed? What warrant of attorney? A. I think so. Q. You think it was? A. Yes. Q. How much? A. I think it was 5% on the gross income. I don't remember distinctly. The power of attorney was returned. I am giving it to the best of my remembrance. Q. Occurred last October? A. Yes."

It is absolutely impossible for me to believe the testimony of Mr. Magoon when he swears that he "sat beside Geo. A. Davis," attorney for the petitioner, for one entire afternoon "and prompted him" and still did not know whether the cause on trial was a suit in equity to restrain the sale of land or an action in probate to declare John K. Sumner *non compos mentis,* until the "next morning" when he looked at the record "and found out that it was the application or effort of Mrs. Maria S. Davis to put Mr. Sumner under guardianship as a person *non compos.* I didn't know that until I looked at the record next morning." In this instance Mr. Magoon either was mistaken as to his knowledge or he swore falsely. In either event his credibility with me is very much weakened and I cannot feel sure that he is not mistaken or is not falsifying in his story about the respondent "attempting to pursuade" him to betray his client.

It may not be improper in this connection to state that notwithstanding the many insinuations made in the opinion of the court against the credibility of the respondent, Humphreys, I do not recall a single instance in the entire record that in any way approaches so near to a demonstration of the unreliability of his testimony as the above incident does that of J. Alfred Magoon.

Again if Mr. Magoon is to be believed he entertained the proposition made to him by the respondent to the extent of submitting it to this client and the venture was not successful for the reason that the client rejected it. Does this not make J. Alfred Magoon equally guilty with the respondent? Under the law the seducer and the seduced are equally infamous. (*In re Cowdery,* 69 Cal. 32 and *In re Whittemore,* id. 67.)

Will justice be done in this case by disbarring the respondent and by giving Magoon a certificate of character for the virtuous indignation he did not show when approached by the tempter? Not by the standard announced by the Supreme Court of California in the cases above cited.

In concluding this discussion I feel justified in stating that I would not convict a cat of stealing cream on the evidence offered in support of this individual charge against the respondent, Humphreys, much less pronounce judgment of disbarment against an attorney who has spent the best years of his life in qualifying himself to adorn the profession, who has heretofore borne an honorable name in the community, and who has been entrusted with high judicial position in this Territory by the President of the United States.

It would be useless to state what punishment to me would seem proper under the charge that has been proven against the respondents but I will state that, in my opinion, the judgment of the court against the respondent, Thompson, is unnecessarily severe and that against th erespondent, Humphreys, is not justified by the law or the evidence.